No. 22-13708

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

Greater Birmingham Ministries,
*Plaintiff-Appellee,*

v.

Secretary of State of the State of Alabama, *et al.*,
*Defendants-Appellants*.

_____

On Appeal from the United States District Court for the
Middle District of Alabama, Case No. 2:22-cv-00205-MHT-SMD

_____

### PLAINTIFF-APPELLEE'S RESPONSE BRIEF

_____

Danielle M. Lang
Christopher M. Lapinig
Valencia Richardson
Campaign Legal Center
1101 14th Street
Suite 400
Washington, D.C. 20005

Joseph Mitchell McGuire
McGuire & Associates LLC
31 Clayton Street
Montgomery, AL 36104

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PERSONS AND DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-2, the undersigned counsel certifies that the following listed persons and entities may have an interest in the outcome of this case:

1.  Allen, Hon. Wes.

The undersigned counsel certifies that all other persons with an interest in the outcome of this case have been previously identified in Defendant-Appellant's opening brief. Counsel for Plaintiff-Appellee certifies that no additional publicly traded company or corporation has an interest in the outcome of this case or appeal.

March 13, 2023                          _/s/ Danielle M. Lang_____
                                        Danielle M. Lang
                                        *Counsel for Plaintiff-Appellee*

i

## STATEMENT REGARDING ORAL ARGUMENT

This appeal raises important questions about the scope of records covered and the method of disclosure required under the National Voter Registration Act's Public Disclosure Provision. Appellee believes oral argument would assist the Court in deciding these issues.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND DISCLOSURE
  STATEMENT.................................................................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES .................................................................................v

STATEMENT OF JURISDICTION....................................................................ix

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE...............................................................................2

    I.   Greater Birmingham Ministries' Voter Outreach .................................3

    II.  NVRA Records Requests by GBM ...........................................................5

        A.  Purged Voters Request..........................................................................5

        B.  Felony Records Request........................................................................6

        C.  NVRA Notice Letters............................................................................7

    III. The Secretary's Maintenance of Electronic Voter Records.........................8

    IV. The Secretary's Provision of Voter Registration Records to the Public......10

        A.  Sale of Voter Records .........................................................................10

        B.  In-Office "Inspection" of Records .......................................................12

    V.  Alabama's Programs and Activities to Ensure Ineligible Individuals with
        Felony Convictions Are Not Registered ...................................................14

    VI. Procedural History....................................................................................15

    VII. Executive Order No. 734...........................................................................17

STANDARD OF REVIEW ..................................................................................18

SUMMARY OF THE ARGUMENT ....................................................................18

ARGUMENT ........................................................................................................20

    I.   The Felony Records Request Falls Within the Scope of the NVRA ...........20

A. The Requested Records Are Covered Records Under Any Plain Reading of the Statute ............................................................20

B. The District Court Did Not Require the Secretary to "Create" New Records in Responding to the Felony Records Request ........................30

II. The Secretary's Appeal as to His Electronic Records Fee Schedule is Moot ...........................................................................................33

III. The NVRA Requires Meaningful Public Access to Voter Registration Records and Only Permits Defendant to Charge, At Most, the Reasonable Cost of Reproduction ...............................................36

A. The Secretary's Obligation to Make Records Available for Public Inspection Requires Meaningful Access to the Records ........................37

B. The NVRA Permits, At Most, the Secretary to Charge for the Reasonable Costs of Production ..............................................44

CONCLUSION ...........................................................................................49

CERTIFICATE OF COMPLIANCE .......................................................50

CERTIFICATE OF SERVICE ................................................................51

## TABLE OF AUTHORITIES

**Cases**

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014) ........................40

*Al Najjar v. Ashcroft*, 273 F.3d 1330 (11th Cir. 2001)...........................................34

*Allapattah Services v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003)....................24

*Anderson v. City of Bessemer City,* 470 U.S. 564 (1985)........................................18

*Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014)..........24, 25, 26

*BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176 (2004) .....................................................37

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) .....................................18, 27, 39

*Commonwealth of Pennsylvania, Department of Environmental Protection v. Cole*, 52 A.3d 541 (Pa. Commw. Ct. 2012).................................33

*Davis v. Oasis Legal Finance Operating Co., LLC*, 936 F.3d 1174 (11th Cir. 2019)................................................................................................30

*Dayton Newspapers, Inc. v. Department of the Air Force*, 35 F. Supp. 2d 1033 (S.D. Ohio 1998) ................................................................33

*Hall v. Secretary of State*, 902 F.3d 1294 (11th Cir. 2018)....................................36

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ........................40

*Illinois Conservative Union v. Illinois*, No. 20 C 5542, 2021 WL 2206159 (N.D. Ill. June 1, 2021) ......................................................................................22

*In re Griffith*, 206 F.3d 1389 (11th Cir. 2000).......................................................37

*In re Walker*, No. 21-10205, 2022 WL 14440021 (11th Cir. Oct. 25, 2022)....................................................................................34

*Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019)...............22, 31

*National Security Counselors v. CIA*, 898 F. Supp. 2d 233 (D.D.C. 2012)............32

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) .......................22

*Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012)................................................................................................21, 26

*Project Vote/Voting for America, Inc. v. Long*, No. 11-1809, 2011 WL
    4947283 (4th Cir. Oct. 18, 2011)........................................................................26

*Project Vote/Voting for America, Inc. v. Long*, No. 11-1809, 2011 WL
    5016558 (4th Cir. Oct. 21, 2011)........................................................................21

*Public Interest Legal Foundation v. Bennett*, No. H-18-0981,
    2019 WL 1116193 (S.D. Tex. Feb. 6, 2019) ......................................................23

*Public Interest Legal Foundation v. Boockvar*, 431 F. Supp. 3d 553
    (M.D. Pa. 2019) .......................................................................................22, 27, 29

*Public Interest Legal Foundation, Inc. v. Bennett*, No. 4:18-CV-00981,
    2019 WL 1112228 (S.D. Tex. Mar. 11, 2019) ...................................................23

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
    996 F.3d 257 (4th Cir. 2021) ..............................................................................22

*Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220 (11th Cir. 2014)..............................41, 42

*Schladetsch v. U.S. Department of H.U.D.*, No. 99-0175, 2000 WL
    33372125 (D.D.C. Apr. 4, 2000) ........................................................................33

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ........................................................29

*United States v. Canals-Jimenez*, 943 F.2d 1284 (11th Cir. 1991) .........................30

*United States v. Criden*, 648 F.2d 814 (3d Cir. 1981) ..............................................40

*United States v. Massino*, 356 F. Supp. 2d 227 (E.D.N.Y. 2005) ...........................39

*United States v. Munchel*, 567 F. Supp. 3d 9 (D.D.C. 2021) ..................................39

*United States v. Steele*, 147 F.3d 1316 (11th Cir. 1998) ..........................................48

**Constitutional Provisions**

Ala. Const. art. V, § 112 ...........................................................................................17

Ala. Const. art. VIII, § 177 .........................................................................................3

**Statutes and Regulations**

5 U.S.C. § 552(a)(3)(C) .............................................................................................33

5 U.S.C. § 552(a)(4)(A)(ii) ........................................................................................47

5 U.S.C. § 552(a)(4)(A)(iii) .......................................................................................47

5 U.S.C. § 552(a)(4)(A)(iv) .......................................................................................47

28 U.S.C. § 1291 ...................................................................................... ix

28 U.S.C. § 1331 ...................................................................................... ix

28 U.S.C. § 1911 ...................................................................................... 48

52 U.S.C. § 20507(a)(1) ............................................................................ 4

52 U.S.C. § 20507(a)(3)(B) ...................................................................... 25

52 U.S.C. § 20507(a)(4) ........................................................................... 28

52 U.S.C. § 20507(b)(2) ............................................................................ 5

52 U.S.C. § 20507(c) ............................................................................... 29

52 U.S.C. § 20507(c)(1) ........................................................................... 29

52 U.S.C. § 20507(c)(2)(A) ..................................................................... 29

52 U.S.C. § 20507(i) ............................................................... 1, 37, 39, 46

52 U.S.C. § 20507(i)(1) ................................................................. 2, 20, 31

52 U.S.C. § 20510(b) ............................................................................... ix

52 U.S.C. § 20510(b)(2) ............................................................................ 8

52 U.S.C. § 21083 ..................................................................................... 8

52 U.S.C. § 21083(a) ............................................................................... 41

52 U.S.C. § 21083(a)(1)(A) ....................................................................... 8

52 U.S.C. § 21083(a)(2)(A)(i) ................................................................... 8

52 U.S.C. § 21083(a)(2)(A)(ii) ................................................................ 27

Ala. Code § 15-22-36.1 .............................................................................. 3

Ala. Code § 17-4-33 .................................................................................. 8

Ala. Stat. § 17-4-35 ................................................................................. 11

Ala. Stat. § 17-4-38 ................................................................................. 11

Ga. Code Ann. § 50-18-71 ...................................................................... 47

La. Stat. Ann. 44 § 32(C)(2) .................................................................... 47

Miss. Code. Ann. § 25-61-7 ..................................................................... 47

N.C. Gen. Stat. Ann. § 132-6.2 ............................................................... 47

S.C. Code Ann. § 30-4-30................................................................47

Va. Code Ann. § 2.2-3704 .............................................................47

45 C.F.R. § 164.524......................................................................48

**Other Authorities**

2017 Alabama Laws Act 2017-378 (H.B. 282) .............................................3

251 Ala. Op. Atty. Gen. 38, 1998 WL 879853 (Ala. A.G. June 12, 1998).............46

*Available*, Merriam-Webster.com Dictionary, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/available ............................38, 40

*Available,* Oxford English Dictionary (3d ed. 2022)....................................38, 40, 43

Charles A. Wright & Arthur R. Miller, 10 Fed. Prac. & Proc. Civ. § 2666
    (4th ed.)................................................................................48

*Executive Order 734* (Jan. 26, 2023),
    https://governor.alabama.gov/newsroom/2023/01/executive-order-
    734/................................................................17, 35, 46, 49

H.R. Rep. 104–795, 1996 U.S.C.C.A.N. 3448 (1996) ............................................32

John Kreienkamp, *The Meaning of Creation: Electronic Databases and
    Creating A Record to Fulfill A Public Records Request*, 47 Rutgers
    Computer & Tech. L.J. 197 (2021)....................................................32

## STATEMENT OF JURISDICTION

Pursuant to Federal Rule of Appellate Procedure 28(b) and Circuit Court Rule 28-2, Plaintiff-Appellee Greater Birmingham Ministries ("GBM") attests that: (1) the district court had subject-matter jurisdiction over GBM's complaint under 52 U.S.C. § 20510(b) and 28 U.S.C. § 1331; (2) this Court has subject matter jurisdiction over the district court's final order and judgment under 28 U.S.C. § 1291; and (3) the district court entered a final judgment on December 5, 2022 and Defendant-Appellant Secretary of State of Alabama (the "Secretary") timely filed his appeal on December 7, 2022.

GBM also agrees with the Secretary that the "capable of repetition, yet evading review" exception to mootness applies with respect to the question of whether the Felony Records Request falls within the scope of the NVRA's Public Disclosure Provision. Secretary's Br. at xv. However, as discussed below, *see infra* Legal Argument, Part II*,* GBM does not agree that the case avoids mootness as to the issue of the Secretary's fee schedule for electronic disclosure. This Court should dismiss the Secretary's appeal on that issue as moot.

## STATEMENT OF THE ISSUES

1.  Whether the district court properly held that records pertaining to voter registration applicants denied registration, or voters removed from the Alabama's active voter rolls, because of a felony conviction constitute "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" under the National Voter Registration Act's Public Disclosure Provision, 52 U.S.C. § 20507(i).

2.  Whether the Secretary's appeal as to his fee schedule for electronic records is moot.

3.  Whether the district court properly held that, under the circumstances of this case, the Public Disclosure Provision required the Secretary to provide the Requested Records in electronic format.

4.  Whether the district court properly held that the Public Disclosure Provision's "reasonable cost" requirement for "photocopying" means that, at most, the Secretary may only charge for the actual cost of reproducing requested records.

1

## STATEMENT OF THE CASE

This appeal concerns Defendant-Appellant Alabama Secretary of State's (the "Secretary") failure to comply with the Public Disclosure Provision of the National Voter Registration Act ("NVRA"), which requires disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Specifically, this appeal concerns two records requests submitted by Appellee Greater Birmingham Ministries ("GBM"). In the first request (the "Felony Records Request"), GBM requested—and, prior to litigation, the Secretary refused to produce—two categories of records: (1) records concerning people removed from Alabama's voter rolls due to a disqualifying felony conviction and (2) records concerning people whose voter registration applications were denied due to a felony conviction. In the second request (the "Purged Voters Request"), GBM requested— and, prior to litigation, the Secretary refused to produce absent payment of a per-voter record fee—records concerning all people removed from Alabama's voter rolls after the 2020 general election.

2

## I.    Greater Birmingham Ministries' Voter Outreach

GBM is a nonprofit organization founded in 1969 to advocate for civil rights in the greater Birmingham area. Doc. 69 at ¶ 3; Doc. 110 at 19:17-19.[1] As a part of its organizational mission, GBM helps citizens with voter registration within Birmingham and throughout the State of Alabama. *See* Doc. 110 at 20:13-21:5.

GBM engages in targeted voter outreach for people with felony convictions. Doc. 110 at 20:13-21:5. Alabama's constitution disqualifies voters convicted of "felonies involving moral turpitude" unless and until those rights are restored. Ala. Const. art. VIII, § 177. In 2017, Alabama enacted the Felony Voter Disqualification Act to clarify which felony convictions involve "moral turpitude" and therefore disqualify voters. *See* 2017 Alabama Laws Act 2017-378 (H.B. 282). Felony convictions not identified in the Act or its subsequent amendments are not disenfranchising. *Id.* As a result, many Alabama citizens with felony convictions do not have a disenfranchising felony conviction and are eligible to vote. Doc. 69 at ¶ 47. And persons who have lost the right to vote due to a conviction for a felony involving moral turpitude are entitled to have their right to vote restored if they meet certain criteria, including completion of sentence for the disqualifying crime and payment of legal financial obligations. *See* Ala. Code § 15-22-36.1; Doc. 110 at

---

[1]    Citations to "Doc." refer to the docket number in the district court. Citations to the Secretary's opening brief before this Court are to "Secretary's Br."

25:15-26:14. Although most Alabamians with felony convictions either did not lose their right to vote or can restore their right to vote, in GBM's experience, most people with felony convictions are unaware of their right to vote or to restore their right to vote. Doc. 78-2 at 44:13-23.

GBM is an expert in Alabama's felony disenfranchisement scheme and assists potential voters and election officials in navigating it. Doc. 110 at 31:21-25. They educate people with non-disqualifying convictions on their right to vote and assist them in registering; identify and assist voters who may have been unlawfully removed from the voter rolls by reason of a non-disqualifying felony conviction and flag those errors for election officials; and assist people with disqualifying felonies in restoring their voting rights. Doc. 110 at 28:16-29:15, 37:10-24.

GBM submitted the Felony Records Request and the Purged Voters Request to further its efforts to ensure eligible Alabamians register and stay on the voter rolls. *See* Doc. 78-2 at 22:3-18; Doc. 110 at 34:25-26:2. In particular, GBM sought the records responsive to the Felony Records Request in order to systematically identify any errors in election officials' administration of the felony disenfranchisement law, enforce the NVRA's mandate that each state "shall . . . ensure that any eligible applicant is registered to vote" in federal elections if the eligible applicant timely submits a "valid voter registration form," 52 U.S.C. § 20507(a)(1), and assist voters who are now eligible or could become eligible to vote, Doc. 78-2 at 45:23-46:14.

GBM sought the records responsive to the Purged Voters Request to ensure that Alabama is complying with the NVRA's strict requirements for list maintenance, including its prohibition on removing individuals from the rolls for simply not voting, 52 U.S.C. § 20507(b)(2), and to assist purged voters who wish to re-register. *See* Doc. 104 at 20:5-11, 21:22-25, 23:13-17, 24:6-12.

## II.    NVRA Records Requests by GBM

### A.    Purged Voters Request

On May 17, 2021, GBM submitted the Purged Voters Request to the Secretary for records of every voter removed from the statewide voter rolls after the 2020 general election. Doc. 69 at ¶ 10; Doc. 72-56 at 1. GBM made this request pursuant to the NVRA and requested these records electronically. Doc. 69 at ¶ 10. On May 25, 2021, the Secretary acknowledged receipt and indicated his office would only provide the requested records to GBM at a cost of one cent per name, or $1,331.40. Doc. 69 at ¶ 11; Doc. 72-57 at 1. The Secretary further explained that GBM was "welcome to come to [his] office to inspect that list and determine if it is a list you would like to purchase" and asserted that "[n]othing in the NVRA or U.S. Code provides for our office to produce and make copies of this data at no cost." Doc. 72-57 at 1. On June 11, 2021, GBM objected to the Secretary's request for a one cent per voter payment, on the basis that the Secretary may not assess a fee unrelated to reproduction costs for records produced under the NVRA. Doc. 69 at ¶ 12; Doc. 72-

5

58 at 1. Between June 23, 2021 and September 15, 2021, the parties exchanged additional correspondence but could not come to an agreement on the Secretary's demand for a one cent per name fee for electronic records. Doc. 69 at ¶¶ 13-15; Docs. 72-59 to 72-61.

### B.    Felony Records Request

On June 11, 2021, GBM made an additional request for records of voter registration applicants and registered voters who had been deemed ineligible and were either denied registration or removed from the rolls. Doc. 69 at ¶ 12; Doc. 72-58 at 1-2. In its June 23 letter, the Secretary denied this request, alleging that the request "move[d] well beyond [the scope of] the NVRA." Doc. 69 at ¶ 13; Doc. 72-59 at 1. In its September 7 letter, GBM objected to the Secretary's assertion that its request was beyond the scope of the NVRA and renewed and narrowed its request under the NVRA to only include registration applicants whose registrations were rejected because of a felony conviction and voters who were removed from the rolls because of a felony conviction (the "Felony Records Request"). Doc. 69 at ¶¶ 1-51; Doc.72-60 at 1-2. In its September 15 letter, the Secretary renewed his refusal to respond to the Felony Record Request and declined to "further elaborate." Doc. 69 at ¶ 16; Doc. 72-61 at 1.[2]

---

[2]    The Secretary's policy of refusing access to felony-related voter registration records appears to be new. In 2018, the Secretary offered the same felony records

### C.    NVRA Notice Letters

On December 8, 2021, GBM formally notified the Secretary that his office's failure to produce records responsive to GBM's Purged Voters Request and Felony Records Request violated Section 8 of the NVRA. Doc. 69 at ¶ 17; Doc. 72-62 at 2. First, GBM notified the Secretary that his office's demand for a fee of one cent per name for records responsive to the Purged Voters Request violated Section 8(i) of the NVRA, which does not permit fees for covered records except for reasonable reproduction costs. *See* Doc. 72-62 at 2. Second, GBM notified the Secretary that his office's rejection of the Felony Records Request also violated Section 8(i) of the NVRA, which requires states to make "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" available for public inspection. *Id.* The Secretary did not respond.

On January 24, 2022, GBM again notified the Secretary that his failure to respond to the Purged Voters Request and Felony Records Request constituted an ongoing violation of the NVRA. Doc. 72-63 at 1.  Since the violation was ongoing within 120 days before the next federal election, GBM's second notice letter

---

GBM now requests to the Southern Poverty Law Center for purchase. *See, e.g.*, Docs. 72-22, 72-23. The Secretary also provided these records to GBM in 2017 after a court ordered him to do so or show cause as to why he should not be required to do so under the NVRA. Doc. 72-20. In 2018, the Secretary sold similar records to the Limestone County NAACP as well. Doc. 72-69 at 10; Doc. 110 at 102-02, 126.

triggered a shorter 20-day notice period under the NVRA. 52 U.S.C. § 20510(b)(2); Doc. 69 at ¶ 18; Doc. 72-63 at 3. The Secretary did not respond. GBM filed suit after the 20-day notice period elapsed. Doc. 69 at ¶ 19.

## III. The Secretary's Maintenance of Electronic Voter Records

Pursuant to the requirements of state and federal law, *see, e.g.*, 52 U.S.C. § 21083,[3] Ala. Code § 17-4-33, the Secretary maintains statewide voter registration records, including the records responsive to GBM's requests, in electronic form. Specifically, the Secretary maintains an electronic database comprising records for all active voters, inactive voters, purged voters, removed voters, deceased voters, denied voter registration applicants, among other voter list maintenance records. *See* Doc. 69 at ¶ 9; Doc. 110 at 59:25-62:10; Doc. 72-17. In the statewide voter registration database, for each voter there is a field for voter registration status—which indicates the voter's registration current status, i.e., active, inactive, not eligible, not registered, disqualified, and suspended—and a field for registrant status

---

[3] The Help America Vote Act requires each State to implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that would "serve as the single system for storing and managing the official list of registered voters." 52 U.S.C. § 21083(a)(1)(A)-(A)(i). The compliance deadline under HAVA was January 1, 2004. As of August 2006, the State of Alabama still had not complied with HAVA's requirement to create an electronic statewide voter list and list maintenance program and made "no credible effort . . . to remedy the violation." Doc. 72-15 at 1. A federal district court placed Alabama's voter registration system under a special master to implement a HAVA-compliant voter registration system. *Id.*; Doc. 69 at ¶ 49. With some modifications, that system remains in place today. *Id.*

reason—which indicates the reason why a voter is in that current status, e.g., death notice, purged, underage. Doc. 69 at ¶ 9; Doc. 110 at 59:25-62:10. The statewide voter registration database retains records of the status history for each individual in the database as well as current status. *See, e.g.*, Doc. 72-21. Through PowerProfile, the Secretary—sometimes with the assistance of its vendor ES&S—can export the records in PowerProfile for subsets of individuals (and with designated data fields) in the statewide voter registration database. *See* Doc. 69 at ¶¶ 21-23, 27-29; Docs. 72-72 to 72-76; Doc. 110 at 61:11-64:10.

With respect to the Purged Voters Request, at the time of the trial, the Secretary had in his possession a list created by ES&S from the records in PowerProfile that reflected GBM's request except that it excluded the data field of current registration status (a field that is kept within PowerProfile). Doc. 69 at ¶¶ 9, 23. With respect to the Felony Records Request, at the time of the trial, the Secretary had in his possession lists created by ES&S from the records in PowerProfile that reflect approximately 2,700 registrants who were denied registration based on a purportedly disenfranchising felony conviction between May 17, 2020 and May 17, 2022 and who were still in that not eligible status for that reason on May 17, 2022 and approximately 9,300 voters who were removed based on a disenfranchising felony conviction between May 17, 2020 and May 17, 2022 and who were still in

9

that removed status for that reason as of May 17, 2022. Doc. 69 at ¶¶ 27-28, Doc. 72-74, 72-75.

The district court found that, while the Secretary "does not maintain on paper the information that GBM has requested," the Secretary "maintains all of the information that GBM has requested in a digital database called PowerProfile." Doc. 90 at 6-7.

## IV. The Secretary's Provision of Voter Registration Records to the Public

### A. Sale of Voter Records

The Secretary routinely sells the list of active and inactive voters, or portions of it. Doc. 69 at ¶ 29; Doc. 90 at 7 (finding that the Secretary "regularly sells [] reports to the public," either emailing reports directly to purchasers or using data-sharing tools such as Dropbox), Doc. 110 at 68:11-15.[4] Since at least 2014, the Secretary has charged one cent per name to produce an electronic copy of any voter list. Doc. 69 at ¶ 7.[5] Those electronic records are provided via email or file transfer in Excel, Access, or text file format. Doc. 69 at ¶ 35; Doc. 110 at 68:19-23.

---

[4]    The lists that the Secretary routinely sells include data outside the scope of voter registration and thus that would fall outside the NVRA's Public Disclosure Provision. Doc. 69 at ¶ 32. Nothing about GBM's claim under the NVRA would preclude the Secretary from continuing to charge one cent per record for that more complete data set.

[5]    For a hard copy print out of the list, the Secretary charges one dollar per page. Doc. 69 at ¶ 44; Docs. 72-10, 72-27, 72-28.

Under state statute, the Secretary may only charge for "reproduction costs" associated with generating voter lists and the costs must be "reasonable." Ala. Stat. § 17-4-38; *see also* Ala. Stat. § 17-4-35; Doc. 72-27. The Alabama Attorney General has advised that a "reasonable fee" means "the actual cost incurred in providing information to the public," and that an "excessive fee should not be charged as the public's right to a copy of public records should not be restricted." Doc. 72-3 at 2. The Secretary has "[a]dmitted that one cent per name is not directly tied to any reproduction costs that the Secretary would incur in providing these records." Doc. 52 at 6; *see also* Doc. 78-1 at 64:3-8. The determination to charge one cent per name was made by a prior Secretary of State, and the Secretary is unaware of the basis for that charge or any independent assessment of what a reasonable cost would be. Doc. 78-1 at 63:21-62:8; Doc. 110 at 81:22-82:4.

The Secretary charges more for its voter list than any state in the country. *See generally* Doc. 72-14. The Secretary charges $37,000 for the entire statewide voter file, while most states charge less than $1,000 for their statewide voter files. *Id.* From 2016 through 2022, the Secretary collected approximately $263,779.73 for voter records sold through its online portal. *See generally* Doc. 72-64. In 2021 alone, the Secretary collected an additional $119,266.68 via requests that were processed by a Secretary of State employee. Doc. 72-66 at 7. In 2022, the Secretary collected

another $37,378.37 via requests processed by a Secretary of State employee. Doc. 72-65 at 9; *see also* Docs. 72-67 to 71-71 (collecting sales from 2016 to 2020).

## B.    In-Office "Inspection" of Records

Except for GBM's request, the Secretary's office does not typically offer such in-office review of records when members of the public request access to voter registration records. Doc. 78-1 at 15:12-16:10.

The Secretary created its so-called "public inspection" policy in response to GBM's lawsuit. Doc. 90 at 7. Under this new "public inspection" policy, the Secretary would use PowerProfile (if necessary, with the assistance of ES&S) to create an Excel or Access electronic file with the responsive requested records and load that file onto a public computer in the Secretary of State's office. Doc. 78-1 at 43:5-44:16; Doc. 110 at 73:1-19. Then, under the new policy, a requestor may view the voter records on a computer in the Secretary's office for up to four hours a day but is prohibited from engaging in "word-for-word copying" or using a flash drive or any other media to copy any files. Doc. 90 at 7-8; Doc. 110 at 75:15-76:10. The requestor is only allowed to take brief notes and is not allowed to take pictures of the records with their cell phones or otherwise manually copy the records. Doc. 78-1 at 67:5-17; Doc. 110 at 75:15-76:16.; Doc. 72-27. Cell phones and other technical equipment are disallowed in the room where the "inspection" takes place. Doc. 110

12

at 75:15-23. A staff member must be present to supervise the requestor at all times, *id.* at 75:10-14.

Under this policy, GBM would not be able to conduct any voter outreach using the lists it publicly "inspects" because it cannot bring a phone into the room, nor can it make a usable record any of the data it reviews. Doc. 110 at 41:6-23. Under this policy, GBM would not be able to compare the data to other publicly available data or otherwise electronically analyze the data to identify potential systemic or individual errors in voter registration practices. *Id.* Under this policy, GBM would not be able to share the data with coalition partners or experts to analyze the data to identify potential systemic or individual errors in voter registration practices. *Id*. The Secretary's office admits that its policy is maintained to prevent the public from reproducing a copy of the records in person without paying for it. *Id*. at 75:15-76:16; Doc. 78-1 at 67:18-21. Unsurprisingly, the record reflects that this in-person option has never been utilized by any member of the public. Doc. 110 at 78:6-79:5.

The cost to the Secretary of producing a list for in-office inspection is the same as it would be to produce the same list for electronic transmission. But overall, it would cost the Secretary more to supervise an in-office inspection of a list of voters than to simply electronically transmit the same list. Doc. 78-1 at 72:24-73:14; Doc. 90 at 8. Nonetheless, the Secretary's policy allows for in-office review of records free of cost, while charging for reproduction. *See* Doc. 72-27. In other words, the fee

assessed by the Secretary is not based on the reasonable cost to produce the list, but rather on the fact that a copy of the data has more utility to the requestor than the ability to view the list at the Secretary's office.

## V.    Alabama's Programs and Activities to Ensure Ineligible Individuals with Felony Convictions Are Not Registered.

Alabama election officials conduct a variety of programs and activities related to people with felony convictions. Doc. 78-1 at 101:5-21; 102:10-21; Doc. 110 at 89:15-93:1. These programs are intended to ensure that ineligible voters are not registered to vote, and eligible voters are not rejected or removed from the rolls and thus seek to safeguard the accuracy of the voter rolls. Doc. 78-1 at 101:5-23, 102:10-21; Doc. 110 at 89:15-93:1. At the application stage, PowerProfile cross-references every voter registration application with the State of Alabama's Administrative Office of Court's conviction records to determine whether an applicant has a disqualifying moral turpitude felony conviction. Doc. 72-10 at 19. If the registrant has a disqualifying felony conviction, county registrars are instructed to deny a voter registration application and notify the applicant of the denial. *Id.*; Doc. 110 at 88:14-89:11. County registrars log every voter registration denial in PowerProfile. Doc. 110 at 91:5-10; Doc. 72-10 at 19. A person denied registration for this reason is marked as not eligible by reason of a moral turpitude conviction.  Doc. 110 at 91:5-10; Doc. 72-10 at 20.

Election officials in Alabama also have several means of removing currently registered people from the rolls after they are convicted of a disqualifying felony. County registrars receive Voter Disqualifying Forms from the Alabama Bureau of Pardons and Paroles whenever a resident is convicted of a disqualifying felony. Doc. 110 at 90:17-91:4; Doc. 72-10 at 20. Likewise, the Secretary receives "daily reports of moral turpitude criminal convictions from the Administrative Office of Courts in batches into the voter registration database which is then split out to the appropriate county." Doc. 78-1 at 97:8-12; Doc. 110 at 90:6-16. The Secretary instructs county registrars to match those records to the voter file and begin the process to remove those registrants from the rolls. Doc. 110 at 91:5-18; Doc. 72-10 at 19-20; *see also generally* Doc. 72-16.

## VI.    Procedural History

A bench trial was held on July 28 and 29, 2022. Doc. 90 at 3. On October 4, 2022, the district court issued an opinion finding in GBM's favor on all claims. *Id.* at 2.

The district court held that the records sought in the Felony Records Request fall within the scope of the Public Disclosure Provision. Doc. 90 at 9. It also held that the Secretary was required to "send to GBM in digital form all of the records it has requested." *Id.* at 17-18. The court held that the Public Disclosure Provision "requires digital access in the specific circumstances of this case, where the records

15

are already kept in digital form, where providing them in any other form would unduly interfere with the NVRA's express purposes, and where the window of time before the registration deadline for the next election is so slim." *Id.* at 21. The district court further held that the Secretary "must provide the records GBM has requested for a reasonable cost." *Id.* at 23. Reasoning that "[t]ime is now of the essence," *id.* at 18, the district court ordered the Secretary to "turn over the requested records in full immediately," *id.* at 25, but further provided that the parties would have "14 days after the November 8 election to reach an agreement as to a reasonable fee for the records requested by and turned over to GBM, based on the actual costs the Secretary incurs in their production to GBM," *id.* at 25-26. Judgment was entered accordingly on the same day. Doc. 91.

The Secretary turned over the requested records to GBM. *See* Docs. 95-4, 95-6, 95-7, 95-9. On November 15, 2022, the parties filed a joint notice indicating that, while the parties reserved the arguments they had asserted throughout the litigation, GBM had agreed to pay the Secretary a $429.17 fee as "reasonable costs" of production of the requested records. Doc. 109 at 1-2.[6]

---

[6]    The notice provided:

The Secretary will accept this payment without waiver of his right to additional payment, should he prevail on appeal. Greater Birmingham Ministries does not concede that the Secretary has any right to demand

16

The Secretary appealed. Doc. 100.

## VII.   Executive Order No. 734

On January 26, 2023, Alabama Governor Kay Ivey signed Executive Order No. 734, titled "Promoting Transparency in State Government through Enhanced Accessibility to Public Records." Office of the Governor, State of Alabama, *Executive Order 734* (Jan. 26, 2023), https://governor.alabama.gov/newsroom/2023/01/executive-order-734/.

The order regulates and limits the fees officials can charge for public records requests submitted to all executive branch agencies, including the Secretary of State's Office. *See id.* at 1-2; *see also* Ala. Const. art. V, § 112 (listing the Secretary of State as one of the enumerated officers of the executive branch). The order directs agencies that they may charge no more than "$20.00 per hour, including a standard, minimum fee of $20.00, for time spent locating, retrieving, and preparing records for production." *Id.* at 4. It also provides that agencies "may charge a per-page fee of up to $.50 for copies produced on standard 8.5x11 paper" but "may *not* charge a per-page fee for documents provided electronically." *Id.* The order additionally

---

additional payment for these records even if the Secretary prevails on appeal.

*Id.* at 2.

permits agencies to "charge any actual costs incurred while processing or responding to a public-records request," such as flash drives or "costs associated with searching electronic databases." *Id.* No other fees are permitted. *Id.*

## STANDARD OF REVIEW

Issues of statutory interpretation are reviewed *de novo*. *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019). "But [the court of appeals] review[s] for clear error factual findings made by a district court after a bench trial." *Id.* "Clear error is a highly deferential standard of review," and a factual finding is only clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, (1985)).

## SUMMARY OF THE ARGUMENT

The district court judgment should be affirmed in all respects.

*First*, the district court correctly held that records responsive to the Felony Records Request fall within the scope of the NVRA's Public Disclosure Provision. The plain language of the Provision and its statutory context, corroborated by relevant case law, confirm that individual voter records pertaining to individuals whose voter registration applications were denied or who were removed from the voter rolls due to a disqualifying felony conviction fall within the scope of the Provision—that is, they are "records concerning the implementation of programs

and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." The district court also correctly held that responding to the Felony Records Request did not require the Secretary to "create" new records.

*Second*, this Court should dismiss the Secretary's appeal with regard to his fee schedule for electronic records as moot. This issue is moot as to GBM's specific requests because the Secretary provided the electronic records to GBM for a negotiated fee pursuant to a court order. In addition, an executive order recently issued by the Governor of Alabama calls into question whether the "capable of repetition yet evading review" exception to mootness applies here, as the Secretary's current fee schedule at issue here is facially noncompliant with this executive order.

*Third*, the district court correctly held that, in the specific circumstances of this case, especially where the relevant records are already kept and produced in digital form, the Secretary did not meet his obligation to provide meaningful disclosure to covered records as required by the Public Disclosure Provision. The district court's conclusion is supported by the plain language of the Provision, its statutory context and purpose, and other courts' interpretation of the public's right to access records.

*Fourth*, the district court properly concluded that the NVRA permits the Secretary to charge, at a maximum, the reasonable costs of reproduction of the requested records. The Public Disclosure Provision only allows states to charge for

"where available, photocopying at a reasonable cost." Thus, imposing costs on the public for access to public records in a manner untethered to the costs incurred by the State is unreasonable, as supported by the Alabama Attorney General's interpretation of state law and judicial interpretations of similar public disclosure statutes.

## ARGUMENT

## I.    The Felony Records Request Falls Within the Scope of the NVRA.

The records responsive to the Felony Records Request fall squarely within the NVRA's Public Disclosure Provision. Furthermore, producing the responsive records did not require the Secretary to "create" new records.

### A. The Requested Records Are Covered Records Under Any Plain Reading of the Statute.

The NVRA's Public Disclosure Provision is broad, requiring disclosure of "*all* records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1) (emphasis added). The Felony Records Request—seeking data on voter registration applicants whose registrations were rejected because of felony conviction and voters who were removed from the rolls by reason of a felony conviction—fits squarely within the plain language of the statute. Noting that "Alabama law requires that individuals convicted of a disqualifying felony offense

be purged from the statewide voter-registration list on a continuous basis . . . and that voter registration applications from individuals with disqualifying felony conviction be denied," the district court correctly held that these activities are taken "to ensure the accuracy and currency of official lists of eligible voters" because "the rolls can be neither current nor accurate if they contain people who are legally prohibited from voting." Doc. 90 at 10-11.

The relevant case law unanimously supports this plain language interpretation of the Public Disclosure Provision. In *Project Vote/Voting for America, Inc. v. Long*, the Fourth Circuit held that the Provision "unmistakably encompasses completed voter registration applications," including rejected registration applications, because "the process of reviewing voter registration applications is a 'program' and 'activity'" that is "plainly 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" 682 F.3d 331, 335-36 (4th Cir. 2012);[7]

---

[7]      In *Project Vote*, a coalition of prominent media organizations filed an amicus brief underscoring the importance of public access to voter registration records to journalists' ability to fulfill their roles as watchdogs, furthering the purposes of the NVRA and bolstering public confidence in the electoral process. Brief for Reporters Committee for Freedom of the Press et al. as Amici Curiae Supporting Appellee, *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 5016558. The amicus brief cited a number of instances in which journalists, analyzing individual voter records, were able to identify errors and inaccuracies. *See id.* at *5-6 ("These select stories exemplify the extent to which journalists rely on voter registration information in identifying errors in the electoral process. Without such oversight, eligible voters could be erroneously or fraudulently barred from registering to vote, while ineligible voters remain on voter registration

*see also id.* at 336 (noting that the NVRA's "use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth"); *see also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1341 (N.D. Ga. 2016) ("[I]n addition to requiring records regarding the processes a state implements to ensure the accuracy and currency of voter rolls, considering the NVRA as a consistent whole, individual applicant records are encompassed by the Section 8(i) disclosure requirements."); *cf. Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 443-45 (D. Md. 2019) (finding the NVRA's Public Disclosure Provision to encompass a request for a state voter registration list); *Ill. Conservative Union v. Illinois*, No. 20 C 5542, 2021 WL 2206159, at *5 (N.D. Ill. June 1, 2021) ("[T]he courts that have addressed the question have uniformly reached the conclusion that the NVRA's reference to 'records' in Section 8(i) includes voter list data." (collecting cases)).

Likewise, in *Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections*, the Fourth Circuit held that the Provision covered records relating to the North Carolina Board of Election's "efforts . . . to identify noncitizen registrants" and remove them from the voter rolls. 996 F.3d 257, 266 (4th Cir. 2021); *see also Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 560-61 (M.D. Pa. 2019)

---

lists, potentially diluting the effect of legitimate votes cast."). The amicus brief concluded: "[D]isclosure of the voter registration applications is necessary to allow the public to verify that the voting registration process is functioning properly." *Id.* at *12.

(holding that an effort to identify non-citizen registrants was "a 'program' or 'activity' designed to . . . ensure an accurate and current list of eligible voters," reasoning that "the Disclosure Provision contemplates an *indefinite* number of programs and activities" (emphasis in original)); *Pub. Int. Legal Found. v. Bennett*, No. H-18-0981, 2019 WL 1116193, at *1 (S.D. Tex. Feb. 6, 2019) (denying motion to dismiss where plaintiff requested records relating to the removal of voters from voter roll "for any reason related to non-U.S. citizenship/ineligibility"), *report and recommendation adopted sub nom. Pub. Int. Legal Found., Inc. v. Bennett*, No. 4:18-CV-00981, 2019 WL 1112228 (S.D. Tex. Mar. 11, 2019).

Notwithstanding the plain language of the statute and all the foregoing cases, the Secretary argues that the Provision "encompasses only list maintenance, and specifically the NVRA's general program of list maintenance for change of address and death," and that "list maintenance" only encompasses removals. Secretary's Br. at 36. In other words, the Secretary contends that "any program or activity" excludes *all* voter registration application denials *and* any removals for any reason other than change of address or death (including disenfranchising felony convictions). But the Secretary's narrow interpretation imposes two limitations found nowhere in the statutory text—first, it limits programs and activities to ensure voter list accuracy to voter registration removals and excludes procedures for determining whether applicants should be added to the rolls, and, second, it further restricts the scope of

23

the Public Disclosure Provision solely to removals based on change of address or death. In other words, the Secretary seeks to rewrite the statute from requiring production of "*all* records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" to only requiring production of "records concerning the removal of voters from the official lists of eligible voters for change of address and death." To state this proposition is enough to refute it: if that is what Congress meant, it could and would have said so. The Secretary's statutory gymnastics are contrary to the text of the provision, the structure of the statute, the case law, and the purpose of the statute. The Court should reject the Secretary's atextual reading of the statute.

*First*, because the statutory text is unambiguous, this Court need not engage with the limitations invented by the Secretary. *See, e.g., Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1254 n.5 (11th Cir. 2003) ("see[ing] no need to parse the legislative history . . . because we consistently have reiterated that the text of a statute controls . . . when the statutory language is unambiguous").

The Secretary's claustrophobic reading of the Public Disclosure Provision cannot be reconciled with the plain meaning of the terms "all," "programs," "activities, "accuracy," and "currency," as used in the Public Disclosure Provision as well as elsewhere in the NVRA. Indeed, the Eleventh Circuit has already rejected a similar attempt to cabin the NVRA's "program[s]" language. In *Arcia v. Florida*

*Secretary of State*, Florida argued that the "program[s]" covered by an NVRA provision concerned only "the removal of registrants who become ineligible to vote after moving to a different state." 772 F.3d 1335, 1348 (11th Cir. 2014). Rejecting this argument, the Eleventh Circuit reasoned, "[s]urely when Congress wrote that the [provision] applied to 'any program,' it intended for the provision to apply to more than just programs aimed at voters who have moved." *Id.*[8] Likewise, here, the NVRA's use of "any program" within the Public Disclosure Provision cannot be unilaterally cabined by the Secretary.[9]

The Secretary provides no explanation for why the *only* programs that ensure the accuracy and currency of the rolls are "list maintenance" programs concerning the removal of ineligible voters, and specifically only those concerning removal due to death or change of address.[10] The NVRA, including its Public Disclosure

---

[8]    Notwithstanding the Secretary's attempts to cast doubt on *Arcia*, *see* Secretary's Br. at 46 n.17, it is binding precedent.

[9]    Notably, *Arcia* concerned the removal of individuals from the voter rolls for alleged non-citizenship, an issue not explicitly mentioned in the NVRA. *Id.* at 1345. Yet the Eleventh Circuit had no trouble concluding that removal from the voter roll for non-citizenship constituted a "program" as contemplated by the NVRA. *See id.* at 1347. By contrast, the NVRA *does* explicitly mention removal from voter rolls due to a disqualifying conviction, 52 U.S.C. § 20507(a)(3)(B), suggesting that, even more than the "program" analyzed in *Arcia*, the Felony Records Request concerns "programs and activities" contemplated by the NVRA.

[10]    Notably, the term "list maintenance," which the Secretary argues is a term of art limited to removals from the rolls, is nowhere in the Public Disclosure Provision. To be sure, list maintenance programs, as the Secretary defines them, are among the programs concerning the accuracy and currency of the rolls, but they are plainly not

Provision, was enacted to ensure that voter lists are "both 'accurate'—free from error—and 'current'—most recent." *Project Vote*, 682 F.3d at 335. "[V]oter lists are not 'accurate' or 'current' if eligible voters have been improperly denied registration or if ineligible persons have been added to the rolls." *Id.* Moreover, the Eleventh Circuit has explicitly rejected the "argument that the NVRA distinguishes between the removals of registered voters who become ineligible to vote and registrants who were never eligible in the first place." *Arcia*, 772 F.3d at 1348.

The Secretary's attempt to cabin the NVRA's scope to only removals specifically due to death or change of residence is even less availing in light of both the NVRA and HAVA's specific provisions governing ineligibility due to a felony conviction. The NVRA directly provides for the denial of voter registration applications, or removal from the rolls, due to a disqualifying felony conviction. *Id.* § 20507(a)(3)(B). And HAVA, in its section addressing "list maintenance"

---

the *only* such programs and activities. As such, the Secretary's citations to DOJ, FEC, and EAC records referring to list maintenance as related to list accuracy and required by the NVRA are unremarkable. *See* Secretary's Br. at 38, n.15, 39, 40-41; *see also* Doc. 90 at 14 (labeling this argument "a non sequitur" because the Public Disclosure Provision is not limited to "list maintenance"). The Secretary's reliance on the Department of Justice website is also particularly inapt given the DOJ's amicus brief in *Project Vote v. Long*, which rejects the Secretary's interpretation. Brief for United States as Amicus Curiae Supporting Appellee, *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283 at *21 ("The maintenance of current and accurate eligible voter lists necessarily encompasses the State's evaluation of voter registration applications and its compilation of updated registration lists.").

specifically *requires* that the State "coordinate the computerized list with State agency records on felony status" in order to "remov[e] names of ineligible voters from the official list of eligible voters." 52 U.S.C. § 21083(a)(2)(A)(ii). These are plainly programs to ensure the accuracy of the rolls.[11] Where it has been advanced elsewhere, this argument has similarly failed. *See Boockvar*, 431 F. Supp. 3d at 561 (rejecting argument that the NVRA's Public Disclosure Provision is limited to records related to registrant death or change in residence) ("[C]ourts routinely permit disclosure of voter-related documents unrelated to registrant death or change in residence.") (compiling cases)).

Finally, the Secretary's argument that the Public Disclosure Provision does not cover individual voter records, based on the Secretary's cramped interpretation of the term "implementation," *see* Secretary's Br. at 47-49, has also been roundly rejected. Indeed, the Secretary selectively quotes an opinion, Secretary's Br. at 48, in which a district court concluded that the Public Disclosure Provision *requires* disclosure of records pertaining to individual applicants. *Project Vote*, 208 F. Supp.

---

[11]    The Secretary argues that because felony removals are subject to different substantive NVRA rules than removals based on change of residence, the former is not covered under the Public Disclosure Provision. While the *Bellitto* Court recognized that, in shaping the substantive rules, "Congress intended to treat the categories of ineligibility differently," 935 F.3d at 1200, the Secretary fails to explain why the entirely understandable need to adopt different programs for different categories of ineligibility renders programs related to felony convictions unrelated to the accuracy of the rolls.

3d at 1337. Comprehensively analyzing the Provision's plain language, interpretative context, statutory purposes, and legislative history, the court— following every other court addressing the issue—rejected the very interpretation of "implementation" that the Secretary advances here. *Id.* at 1337-41. The only other support the Secretary advances for his argument that "*all* documents" concerning "implementation" should be cabined to policies or manuals and the like is a 1993 FEC guidance document that only obliquely supports his reading,[12] and he admits provides *no* reasoning whatsoever. Doc. 90 at 15. As the district court concluded, "[a]bsent any other compelling reason why the public-inspection provision should be read to exclude [individual] records," the Court should "decline[] to adopt such a reading." *Id.*

*Second*, the Secretary's argument that the NVRA, in context, supports its proposed limitations similarly fails. To the contrary, the Secretary's examples of other places where the NVRA uses the term "program" just highlight that when Congress sought to cabin the term to removals, to specific types of removals, or otherwise, it did so explicitly. *See* 52 U.S.C. § 20507(a)(4) (requiring a "general

---

[12]    The pre-HAVA FEC document merely asserts, without reasoning, that keeping records of all removals was not required. It did not, however, say that any such document in the states' possession would not be subject to disclosure. In fact, the guide's suggestion that, in light of the Public Disclosure Provision, states maintain those records "[a]s a matter of prudence," implies those records would be disclosed. Secretary's Br. at 47.

program . . . to remove the names of ineligible voters from the official lists of eligible voters by reason of: (A) the death of the registrant; or (B) a change in the residence of the registrant"); § 20507(c) (concerning "Voter removal programs"); § 20507(c)(1) (describing a "program under which" the State uses national change of address information to update its voter registration rolls); § 20507(c)(2)(A) (placing limits on "any program the purpose of which is to systematically remove the names of ineligible voters"); *see also* Doc. 90 at 12 (noting that the Public Disclosure provision does not have the limitation to residence or death contained in § 20507(a)(4)). If Congress sought for "program" in the Public Disclosure Provision to be similarly limited to removals, it could have, and would have, used the same limiting language it did in these provisions. Instead, it chose broader language. *See Boockvar*, 431 F. Supp. 3d at 560 ("We presume that when Congress uses different language in separate subsections of the same statute, it intends different meanings.") (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004)).

Likewise, Congress's exclusion of felony removals from the 90-day bar on systematic removal programs demonstrates that such removals are otherwise encompassed by the NVRA's more general provisions. *See also* Doc. 90 at 12-13 ("one might infer from the fact that the NVRA expressly excludes programs related to the removal of felons from its 90-day bar on removal activities that, if Congress had intended to exclude records relating to the removal of felons from the scope of

the public-inspection provision, it would have said so"). Moreover, Congress' explicit carve-out from the Public Disclosure Provision for "records relat[ing] to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered" only makes sense if the Public Disclosure Provision *includes* voter registration records. Doc. 90 at 14-15 (noting that the Secretary's interpretation would render this language surplusage); *see Davis v. Oasis Legal Fin. Operating Co., LLC*, 936 F.3d 1174, 1180 (11th Cir. 2019) (noting that the Eleventh Circuit "disfavor[s]" interpretations that render statutory language "meaningless, redundant, or mere surplusage" (quoting *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991)).

GBM's Felony Records Request sought records squarely within the scope of the Public Disclosure Provision, and the district court properly ordered the Secretary to produce the requested records.

### B. The District Court Did Not Require the Secretary to "Create" New Records in Responding to the Felony Records Request.

The Secretary further argues that the district court erroneously ordered him to "create" records in response to the Felony Records Request, as the Public Disclosure Provision only requires him to "maintain" and "make available" existing records.[13]

---

[13] Even if the Secretary's argument prevailed here (it should not), it does not get him very far since the Secretary admits that, at the time of trial, he already had in his possession lists with most of the data GBM requested. *See* Doc. 69 at ¶¶ 9, 23, 27-28; Docs. 72-74, 72-75.

This argument is without merit. It is undisputed that the Secretary had records of all the requested information within its PowerProfile database. Doc. 69 at ¶ 49; Doc. 104 at 59:25-60:3. In order to comply with the district court's order, the Secretary merely pulled those records for GBM to access and review. Doc. 95 at 6. Since the Secretary has, as required, maintained these records, he must "make [them] available." 52 U.S.C. § 20507(i)(1).

The district court correctly rejected the Secretary's argument below. The district court reasoned:

> By this logic, the [Public Disclosure Provision] would require Secretary Merrill, in response to a request for any subset of information in the PowerProfile database, to either disclose the entire database or nothing at all. If Secretary Merrill wishes to disclose the entire database, so be it . . . . But the second of these options—disclosing nothing at all—is off the table.

Doc. 90 at 16-17.[14]

The district court's ruling is consistent with all relevant case law. For example, in *Judicial Watch*, 399 F. Supp. 3d at 442, an advocacy organization requested the production of a voter registration list pursuant to the Public Disclosure Provision. *Id.* at 430-31. Like the Secretary here, the defendants argued that production of such a

---

[14] Notably, the Secretary does not suggest that he would be willing to produce the contents of the PowerProfile database, or the contents of the database that are responsive to the request. If required to turn over the records, it is GBM's understanding that the Secretary would prefer to do so through a list such as the one it disclosed to GBM rather than the raw database contents.

list would unlawfully require them to create new records. *Id.* at 441. Rejecting this argument, the district court reasoned that "the production of the requested list amounts to little more than 'the application of codes or some form of programming.'" *Id.* at 442 (quoting *Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 270 (D.D.C. 2012)); *see also* H.R. Rep. 104–795, 1996 U.S.C.C.A.N. 3448, at 22 (1996) ("Computer records found in a database rather than a file cabinet may require the application of codes or some form of programming to retrieve the information. . . . [T]he review of computerized records would not amount to the creation of records.").

Indeed, generally, "courts around the country appear to agree that public bodies are required to search and query their electronic databases for responsive records . . . ." John Kreienkamp, *The Meaning of Creation: Electronic Databases and Creating A Record to Fulfill A Public Records Request*, 47 Rutgers Computer & Tech. L.J. 197, 217 (2021) (collecting cases). "This search, even where it requires the creation of a new program or search mechanism, does not constitute the creation of a new record but rather the public body's fulfillment of its duty to search and account for all responsive records." *Id.* As one state court observed, "[t]o hold otherwise would encourage an agency to avoid disclosing public records by putting

information into electronic databases." *Commonwealth of Pennsylvania, Dep't of Env't Protection v. Cole*, 52 A.3d 541, 549 (Pa. Commw. Ct. 2012).[15]

The Secretary fails to address any of this precedent.[16] The district court properly held that producing records responsive to the Felony Records Request did not require the Secretary to "create" new records. Its ruling should be affirmed.

## II.  The Secretary's Appeal as to His Electronic Records Fee Schedule is Moot.

This Court should dismiss the Secretary's appeal with regard to his fee schedule for electronic records as moot.[17]

---

[15] The Secretary's assertion that responding to the Request took a cumulative total of twenty-five hours of its vendor and staff's time is immaterial. *See* Secretary's Br. at 51. In the Freedom of Information Act ("FOIA") context, government agencies are routinely required to perform searches of electronic databases except where such searches "significantly interfere with the operation of the agency's automated information system." 5 U.S.C. § 552(a)(3)(C). Courts have rejected agency arguments that either a search taking 51 hours, *Dayton Newspapers, Inc. v. Dep't of the Air Force*, 35 F. Supp. 2d 1033, 1035 (S.D. Ohio 1998), *on reconsideration*, 107 F. Supp. 2d 912 (S.D. Ohio 1999), or a search taking 185 hours would "significantly interfere" with agency operations, *Schladetsch v. U.S. Dep't of H.U.D.*, No. 99-0175, 2000 WL 33372125, at *4 (D.D.C. Apr. 4, 2000). In any event, the time required to respond to GBM's request was greatly enlarged by the Secretary's and his vendor's errors in compiling the records requested on the first attempt and by his failure to comply with his obligations until the court ordered him to do so. *See* Doc. 95-1.

[16] Moreover, his argument would mean that states could shield all voter registration records—including those about removals based on death and change of address, which he concedes are covered by the NVRA—from the public simply because they are stored electronically in compliance with state and federal law.

[17] The issue of whether "public inspection" encompasses electronic disclosure and the reasonableness of the fee schedule are intertwined. There is no dispute that

A case is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (internal quotations and citations omitted). *"*If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the [issue] is moot and must be dismissed." *Id.*

The issue of the Secretary's fee schedule is moot as to GBM's specific requests because the Secretary provided the electronic records to GBM for a negotiated fee. Doc. 109 at 1. The Secretary argues that this Court "can provide relief by ordering GBM to pay the Secretary's fee (minus a credit for $429.17)." Secretary's Br. at xiv-xv. But this relief is unavailable to the Secretary.[18] GBM has consistently objected to paying the required fee for the requested records. By receiving its requested records through a lawfully obtained court order—for which

---

the Secretary will provide electronic voter records, only that he charges a one cent per voter fee for them. Therefore, if the fee issue is moot, so is the question of the scope of "public inspection."

[18]     Even if the Court finds these claims are not moot, such specific requests for relief, not made to or addressed by the district court, *see* Doc. 91, are appropriately made at the district court in the first instance. *See e.g.*, *In re Walker*, No. 21-10205, 2022 WL 14440021, at *1 (11th Cir. Oct. 25, 2022) ("To the extent any of the various grievances and requests for relief that [appellants] raise on appeal are collateral matters, those arguments and requests for relief are outside the scope of this appeal.").

the Secretary did not seek an emergency stay—GBM did not undertake any obligation to pay the Secretary's proposed fees. The Secretary provides no support for his suggestion otherwise. Therefore, the Secretary's comparison to jurisdiction in a damages case, Secretary's Br. at xv, is inapposite.

And while the "capable of repetition yet evading review" exception to mootness might ordinarily apply, recent developments call into question whether the Secretary will be able to continue to impose his fee schedule. On January 26, 2023, the Governor signed an executive order directing executive agencies (like the Secretary's) that they may charge no more than "$20.00 per hour, including a standard, minimum fee of $20.00, for time spent locating, retrieving, and preparing records for production," "may *not* charge a per-page fee for documents provided electronically," but may "charge any actual costs incurred while processing or responding to a public-records request," such as flash drives or "costs associated with searching electronic databases." *Executive Order 734* (Jan. 26, 2023), https://governor.alabama.gov/newsroom/2023/01/executive-order-734/ (emphasis added). No other fees are permitted. *Id.* Agencies have until the end of April to comply. *Id.*

Given that the current fee schedule at issue in this case is facially not compliant with the executive order, its viability under state law is, at minimum,

unclear.[19] And it is unlikely that GBM would challenge a fee schedule for electronic records that complies with this executive order. As such, the case in its current posture is a poor candidate for application of the "capable of repetition, yet evading review" exception. *See Hall v. Secretary of State*, 902 F.3d 1294, 1297 (11th Cir. 2018) (holding that the exception only apples where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, *and* (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again") (emphasis added). The Court should dismiss this part of the Secretary's appeal as moot.

## III.    The NVRA Requires Meaningful Public Access to Voter Registration Records and Only Permits Defendant to Charge, At Most, the Reasonable Cost of Reproduction.

The district court correctly found that, under the facts of this case, the NVRA required the Secretary to produce electronic copies of the requested records, and that his one cent per name fee was unreasonable. Contrary to the Secretary's suggestion, the district court did not hold that the NVRA always requires disclosure of electronic records to satisfy its obligations under the Public Disclosure Provision. Secretary's Br. at 23-31; *see* Doc. 90 at 21 ("[T]he court does not hold that the provision always requires digital access."). Rather, the district court correctly held that "in the specific

---

[19]     Counsel for the Secretary advised that the Secretary does not intend to change his fee schedule for voter records to comply with the order but declined to provide any reasoning for that decision.

circumstances of this case, where the records are already kept in digital form, where providing them in any other form would unduly interfere with the NVRA's express purposes," and where "[t]o hold otherwise would be to sanction precisely the kind of 'administrative chicanery . . . [and] inefficiencies' that the NVRA was designed to prevent," the Secretary's refusal to produce electronic records violated his obligation to make the requested records available for public inspection. *Id.* (quoting *Project Vote,* 682 F.3d at 335). The district court also correctly held that a steep fee for records—untethered to any costs the Secretary incurs to produce them—is not permitted under the NVRA. *Id.*

### A. The Secretary's Obligation to Make Records Available for Public Inspection Requires Meaningful Access to the Records.

The NVRA's Public Disclosure Provision provides that States must "make available for public inspection and, where available, photocopying at a reasonable cost" records covered under the Act. 52 U.S.C. § 20507(i). The Secretary's argument on appeal hinges on his interpretation that "public inspection" can only mean "viewing a record where it is located." Secretary's Br. at 27.  Not so.

As always in statutory interpretation, the Court begins with the text and gives words their ordinary meaning. *See, e.g., BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183 (2004); *In re Griffith*, 206 F.3d 1389, 1393 (11th Cir. 2000). As the Secretary notes, "[i]nspect" means "[t]o look carefully into" or "to view closely and critically" or "to view closely in critical appraisal." Secretary's Br. at 26-27. And "available"

37

means "able to be used" or "at one's disposal," *Available,* Oxford English Dictionary (3d ed. 2022), or "accessible" or obtainable," *Available*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/available. Thus, under the Public Disclosure Provision, the Secretary has a duty to make the records "accessible," "obtainable," or "able to be used" for the public to "view [them] closely in critical appraisal." *Id.*

Nothing in this definition restricts the manner in which the records should be made accessible for public scrutiny[20] or limits that access to "viewing a record where it is located," and indeed "able to be used" suggests the records must be made available in a manner that allows for them to actually be utilized, not just seen. At best, it is ambiguous whether "public inspection"—read in isolation—is strictly limited to "viewing a record where it is located." Secretary's Br. at 27.[21]

But, as this Court has already explained in the NVRA context, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself,

---

[20]   This plain meaning definition allows states substantial flexibility in how it makes records available, so long as the access allows public scrutiny of the materials. If "public inspection" meant what the Secretary suggests, a plaintiff would have a cause of action if an official chose to provide electronic disclosure rather than inviting the public into her office for review. The statute does not require such an absurd result.

[21]   Other statutes specifically note the precise place for "public inspection." Secretary's Br. at 27. The district court correctly noted that "one might infer from the fact that these statutes specify that public inspection shall occur in an office or other discrete location that, if Congress had intended to so limit the scope of the NVRA's public-inspection provision, it would have said so." Doc. 90 at 22-23.

38

the specific context in which that language is used, and the broader context of the statute as a whole." *Bellitto*, 935 F.3d at 1200. The context of statute refutes the Secretary's cramped reading of "public inspection." The provision is entitled "Public disclosure of voter registration activities," evincing the Act's intent to require meaningful disclosure. 52 U.S.C. § 20507(i). The provision requires "where available, photocopying at a reasonable cost," which necessarily contemplates the reproduction of covered records. *Id.* Finally, the provision requires public disclosure "for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.*[22] The district court was correct to eschew a definition that would allow the Secretary to frustrate the NVRA's purpose. *See infra* at 34-36.

Moreover, the district court's determination, at least under the facts of this case, that "public inspection" encompasses electronic disclosure is consistent with other courts' interpretation of the public's right to access to records. *United States v. Munchel*, 567 F. Supp. 3d 9, 15-16 (D.D.C. 2021) ("The common law right of access has long encompassed the right to 'copy public records.'"); *United States v. Massino*, 356 F. Supp. 2d 227, 236 (E.D.N.Y. 2005) ("Historically, courts have defined the right of access as incorporating both the right to inspect court materials and the right

---

[22] In other words, the statute recognizes that "[i]nspection need not be–and generally is not–an aim unto itself. Rather, the right to access voter records serves as a necessary foundation for a broad array of opportunities to engage and to make use of those records as the requesting party sees fit." Doc. 90 at 19.

to copy them."); *United States v. Criden*, 648 F.2d 814, 823 (3d Cir. 1981) ("[I]t is necessary to bear in mind that generally the right to copy has been considered to be correlative to the right to inspect.").[23]

Under the plain meaning of the statute and the facts of this case, the district court correctly held that the Secretary did not make the records "accessible," "obtainable," or "able to be used" for the public to "view [them] closely in critical appraisal." *Available,* Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/available. *Cf.* Doc 90 at 21-23. Several factors support this conclusion.

*First,* Alabama's statute implementing the NVRA's public inspection requirement provides for electronic access to voter registration records. As the Secretary admits, Alabama passed § 17-4-38 of its code to implement the NVRA's

---

[23]    Reading "public inspection" to encompass access to copies would not "produce a nonsensical result" simply because Congress also chose to specify that photocopying should be provided where available. It is not unusual for a statute to provide a broad mandate—like making records available for public inspection—and follow it with a more specific requirement. *Cf. Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 699 (D.C. Cir. 2014) (reasoning that a statute's general provision's "broad grant of authority . . . fills a space that the specific provisions do not occupy"). And this Court cannot read anything into Congress's choice to update the Freedom of Information Act to specify electronic disclosure but not the NVRA. First, "Congressional inaction lacks persuasive significance because it is indeterminate . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 300 (2014) (internal quotation marks omitted). Second, that is particularly true here where Congress updated FOIA to impose very specific electronic disclosure requirements—e.g., requiring an agency to provide records in any format the requester seeks—on federal agencies that it may not have wished to impose on the states.

Public Disclosure Provision. Secretary's Br. at 9-10. It did so by (1) "broaden[ing] the list of people who could request voter lists," Secretary's Br. at 9 (and thus make them available to the public) and (2) requiring the Secretary to provide a "basic electronic copy" via "transmission of tapes, discs, or lists" of those records to requestors, § 17-4-38(a)-(b). *See* Doc. 79-5 (preclearance file for § 17-4-38 explaining that the voter lists provision was added to comply with the NVRA). Therefore, even in 1994, Alabama understood that the most appropriate manner to provide these records to voters is via electronic disclosure.

*Second*, the records are kept in electronic format. Doc. 90 at 21. It is undisputed that the Secretary only maintains the Requested Records electronically. *E.g.,* Doc. 110 at 70:10-16. Under the Help America Vote Act ("HAVA"), states are required to conduct list maintenance and keep list maintenance records entirely in electronic format. 52 U.S.C. § 21083(a). The Secretary contends that because Congress did not amend the Public Disclosure Provision when it passed HAVA, Congress did not intend for the Public Disclosure Provision to require production of electronic records. Secretary's Br. at 48. But HAVA's requirement for electronic maintenance of records need not be read as incompatible with the NVRA's requirement of public disclosure of voter registration records, and "when Congress passes two statutes that may touch on the same subject, [courts] give effect to both unless doing so would be impossible." *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220,

41

1225 (11th Cir. 2014). Here, the district court properly gave effect to both Acts by requiring the disclosure of the Requested Records under the NVRA in the format that they are kept under HAVA. *See* Doc. 90 at 21-22 (requiring electronic production "where the records are already kept in digital form").

*Third,* the Secretary provides the requested records in electronic format to the public routinely (albeit at a steep price). Doc. 69 at 8; *see also* Secretary's Br. at 10.[24] Indeed, the Secretary has created an online portal for these requests. *Id.* at 9. These lists are "transmitted usually by e-mail in an Excel format or maybe a text file." Doc. 110 at 68:19-20. When a member of the public requests these records, the Secretary offers them electronically. *Id.* at 68:6-10 ("When somebody requests a voters list, you know, we're assuming that they're wanting to buy the voters list."). Indeed, the Secretary only promulgated guidelines for in-person viewing after the commencement of this litigation. Doc. 110 at 74:15-24; *see also* Doc. 90 at 20 n.2. Thus, it is not the case that the Secretary is offering in-office "inspection" because that is the most appropriate or convenient means to offer public access to the records. To the contrary, the record establishes that in-office "inspection" will cost the Secretary more in time and resources than electronic disclosure. *See* Doc. 104 at 79; Doc. 90 at 20 n.2; Doc. 78-1 at 72:24-73:13. This factual context not only

---

[24]    Given this fact, the Secretary's invocation of a potential "identity thief" as a reason to justify its policy is disingenuous. Secretary's Br. at 31.

underscores that these records are only useful (i.e. "able to be used," *see Available,* Oxford English Dictionary (3d ed. 2022)) in electronic format but also suggests that the Secretary's motivation for this policy is to either frustrate public access or safeguard a useful revenue stream (or both), *see* Doc. 90 at 20 n.2 ("The court is hard-pressed to furnish a reason why [the Secretary] would refrain from sending the records to GBM in digital form except to frustrate the aims of the public-inspection provision by making it more difficult and costly for GBM to access the records to which it is entitled.").

*Fourth*, the Secretary's in-person office "inspection" policy is tailor-made to hamstring public scrutiny. The Secretary's offer is for GBM to review tens of thousands of records at his office at a public terminal—under surveillance, with "limited" note taking, and a four-hour-per-day limit. Doc. 110 at 75:10-78:5. Cell phones are prohibited, as are cameras and any other "video/audio equipment." Doc. 79-20. Therefore, the public cannot conduct outreach to voters on the lists during any "inspection" nor can they compare the data against other databases to conduct any analysis. Members of the public are strictly forbidden from making any electronic copies of the data themselves and instead must pay the mandated fee for any copies. *Id.*; Doc. 110 at 79:25-80:4; 71:9-17.[25] This is not a policy created to

---

[25]     By the Secretary's own admission, his "public inspection" policy is a transparent attempt to ensure the public cannot obtain the public data without

allow the public "to view [the records] closely in critical appraisal." Secretary's Br. at 26-27. As such, it is unsurprising that no member of the public has ever accepted the Secretary's offer of public viewing of the records. Doc. 110 at 78:6-19.

Thus, the district court rightly concluded that electronic production is required "in the specific circumstances of this case, where the records are already kept in digital form, [and] where providing them in any other form would unduly interfere with the NVRA's express purposes." Doc. 90 at 21. Mere in-person viewing, as the Secretary proposes, is insufficient to constitute public inspection under the Act.

### B. The NVRA Permits, At Most, the Secretary to Charge for the Reasonable Costs of Production.

If "public inspection" includes, in these circumstances, access to the electronic records, the NVRA arguably does not allow the Secretary to impose any fee for that access. *See* Doc. 90 at 22-23 (quoting Defendant stating that "the statute does not allow the State to charge for any cost associated with public inspection"); *see also* Doc. 110 at 73:20-22; *Project Vote*, 208 F. Supp. 3d at 1352 (requiring Georgia to produce electronic voter records under NVRA) ("The absence of a cost provision in the public inspection provision of the NVRA—and its inclusion in other

---

payment of his fee. *See* Doc. 110 at 75:21-23 (Q: And the motivation for this rule is to prevent folks from getting around having to pay for these lists; is that right? A. Generally, I would say yes.); *see also id.* at 76:2-5 (confirming that the "motivation behind [the policy's restriction] is to prevent folks from copying down everything that's in the list").

record disclosure laws—suggests Congress intended States to shoulder the burden" except for reasonable photocopying costs.).[26]

However, GBM did not contest payment of the reasonable costs of actual production of the requested records. Doc. 90 at 24-25. Thus, the district court correctly held that the Secretary may only seek reasonable costs for electronic records "tethered to the actual costs he incurs in producing responsive voter records" which might include, for example, "the costs of a thumb drive to transfer information or of the staff time required to execute a request." Doc. 90 at 25-26. The Secretary admits that his fee schedule is not, in any way, tied to the costs of production of voter records. Doc. 110 at 66:14-18; 71:9-17; 81:22-82:4; *see also* Secretary's Br. at 35 (arguing that the rate is reasonable because "[o]ne cent is the lowest indivisible unit of money"). Indeed, the record reflects that the Secretary charges $37,000 for the statewide voter file even though it takes his staff no more than 30 minutes to produce it and he incurs no other costs in providing it to the requester.[27] *See* Doc. 110 at

---

[26]    The Secretary now argues that the NVRA's provision for "photocopying at a reasonable cost" sanctions his charging a fee for electronic copies. To the extent that the Secretary concedes that "photocopying" implicitly covers other forms of reproduction, GBM does not disagree. But, elsewhere, the Secretary argues the opposite. Secretary's Br. at 25. He cannot have it both ways.

[27]    The Secretary argues that his production costs for the Felony Records Request would have exceeded his one cent per name fee. Secretary's Br. at 34 n.12. This issue is not before the Court because the parties agreed on a fee for the Secretary's actual costs of production of those specific records. However, GBM notes that the Secretary's calculation conflates the costs of production (e.g., a flash drive or the

70:17-20 (confirming that the process of exporting a requested list and sending it to the requester takes approximately 15 to 20 minutes); Doc. 52 at ¶ 23 (Defendant averring that $37,000 reflects the one cent per voter fee for the 3.7 million voters on Alabama's active and inactive voter rolls). Therefore, the district court correctly held that the fee schedule is unreasonable. Doc. 90 at 25-26.

The Public Disclosure Provision only allows the States to charge for "where available, photocopying at a reasonable cost." 52 U.S.C. § 20507(i); *see also Project Vote*, 208 F. Supp. 3d at 1351 (holding that the limited costs provision in the Public Disclosure Provisions suggests that "Congress intended States to shoulder the burden" except for reasonable photocopying costs). Imposing costs on members of the public for access to public records in a manner untethered to the costs incurred by the State is unreasonable. Fees for public records ordinarily must be tied to direct costs incurred by the producing agency, including in Alabama. *See* 251 Ala. Op. Atty. Gen. 38, 1998 WL 879853 at *39 (Ala. A.G. June 12, 1998) ("A 'reasonable fee' has been interpreted to mean the actual cost incurred in providing information to the public."); *Executive Order 734* (Jan. 26, 2023), https://governor.alabama.gov/ newsroom/ 2023/01/executive-order-734/ (restricting fees for electronic public records to a $20 per hour search fee and any other actual costs); *see also Judicial*

_____

time spent formatting and sending the file) and the costs of the Secretary's internal difficulties with its vendor in properly pulling the relevant records sought by GBM. *See* Doc. 95-1 at ¶ 3, ¶¶ 12-22; Doc. 95 at 8.

*Watch v. Dep't of Transp.*, 2005 WL 1606915 (D.D.C. 2005) ("Generally, a FOIA requestor must pay reasonable costs for the search, review, and duplication of the records sought."); 5 U.S.C. § 552(a)(4)(A)(ii)-(iv) (limiting FOIA fees to "reasonable standard charges" and indicating such charges should only include "direct costs").[28] There is no reason why this Court should deviate from that standard in the NVRA context, particularly where Congress specifically tied the permissible costs to photocopying. As such, the Secretary's attempts to justify its fee schedule by comparing it to other types of market-value based fees fall flat. Secretary's Br. at 34-35; *see also id.* (justifying the fee because the demographic information "is obviously valuable").[29]

---

[28]    States across the country, including neighboring states, only assess the actual cost of reproduction for public records. *E.g.*, Ga. Code Ann. § 50-18-71 ("An agency may impose a reasonable charge for the search, retrieval, redaction, and production or copying costs for the production of records"); La. Stat. Ann. 44 § 32(C)(2) (assessing "copying fees" for public records of state agencies); Miss. Code. Ann. § 25-61-7 (only allowing states to assess costs "reasonably calculated to reimburse it for, and in no case to exceed, the actual cost of searching, reviewing and/or duplicating and, if applicable, mailing copies of public records"); N.C. Gen. Stat. Ann. § 132-6.2 (only assessing the "actual cost" of reproduction and limiting actual costs to "direct, chargeable costs related to the reproduction of a public record as determined by generally accepted accounting principles"); S.C. Code Ann. § 30-4-30 (assessing fees "not to exceed the actual cost of the search, retrieval, and redaction of records"); Va. Code Ann. § 2.2-3704 ("[A] public body may make reasonable charges not to exceed its actual cost incurred in accessing, duplicating, supplying, or searching for the requested records and shall make all reasonable efforts to supply the requested records at the lowest possible cost.").

[29]    The Secretary argues that the NVRA's Public Disclosure Provisions grants states deference to set a "reasonable fee." Secretary's Br. at 33. But the term "fee"

The Secretary argues that reasonableness is determined at the discretion of the State, because "Congress did not limit the fee to reproduction costs or say that the fee had to be done one way." Secretary's Br. at 33. Not so. The Public Disclosure Provision limited any fees to photocopying and imposed a "reasonable cost" standard. As the Secretary points out, we "must presume that Congress said what it meant and meant what it said"; if Congress had intended to provide for other costs, it would have specified as much. Secretary's Br. at 31 (quoting *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998).

The Secretary's fee schedule for voter records is by far the highest in the nation. Doc. 72-14.[30] The vast majority of states charge less than $1,000 for their entire statewide voter files. *Id.* Moreover, it is directly at odds with both recent and

---

appears nowhere in the provision. Rather, the Provision only allows States to charge for photocopying "at a reasonable cost." Cost, in this context and many other statutes, refers to actual and direct costs incurred by the charging party. *See, e.g.*, *supra* note 28 (compiling public records statutes limiting "costs" to the actual cost of producing records); Charles A. Wright & Arthur R. Miller, 10 Fed. Prac. & Proc. Civ. § 2666 (4th ed.) (defining costs under Fed. R. Civ. P. 54 as "those charges that one party has incurred" in the litigation); 28 U.S.C. § 1911 (assessing "the cost of serving process, and other necessary disbursements incidental to any case before the [Supreme Court]"); 45 C.F.R. § 164.524 (providing for a "cost-based fee" for copying health records under the Health Insurance Portability and Accountability Act which can only include the cost of copying, supplies, postage, and preparing a summary of information).

[30]     In 2016, Arizona was sued under the NVRA's Public Disclosure Provision for imposing an identical one cent per name fee for electronic voter records. Doc. 72-1. In 2017, Arizona's Secretary of State entered into a settlement agreement to charge substantially reduced fees for electronic production—between $.0000625 and $.0005 per record—in order to comply with the NVRA. Doc. 72-2.

longstanding Alabama law on fees for public records. *Executive Order 734* (Jan. 26,

2023),       https://governor.alabama.gov/newsroom/2023/01/executive-order-734/;

Doc. 72-3. By any standard, it is unreasonable.

*     *     *

The district court properly held that the Secretary was required to produce the

Requested Records electronically and set a fee schedule for records disclosure

tethered to the actual costs of production.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully Submitted,

*/s/  Danielle M. Lang_____*
Danielle M. Lang
Christopher M. Lapinig
Valencia Richardson
Campaign Legal Center
1101 14th Street
Suite 400
Washington, D.C. 20005

Joseph Mitchell McGuire
McGuire & Associates LLC
31 Clayton Street
Montgomery, AL 36104

*Counsel for Plaintiff-Appellee*

49

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 27(d)(2) because it contains 12,828 words as counted by the word-processing system used to prepare it.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: March 13, 2023                    */s/  Danielle M. Lang*_____
                                         Danielle M. Lang
                                         *Counsel for Plaintiff-Appellee*

50

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on March 13, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 13, 2023                     */s/ Danielle M. Lang*
                                          Danielle M. Lang
                                          *Counsel for Plaintiff-Appellee*