No. 22-13708

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

GREATER BIRMINGHAM MINISTRIES,

Plaintiff-Appellee

v.

SECRETARY OF STATE FOR THE STATE OF ALABAMA,

Defendant-Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE
ON THE ISSUES ADDRESSED HEREIN

_____

KRISTEN CLARKE
 Assistant Attorney General

TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C. 20044-4403
 (202) 598-0243

*Greater Birmingham Ministries* v. *Secretary of State for the State of Ala.*,
No. 22-13708

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, the

United States as amicus curiae certifies that, in addition to those identified in

the briefs filed by plaintiff-appellee and defendant-appellant, the following

persons may have an interest in the outcome of this case:

1. Bokat-Lindell, Noah B., U.S. Department of Justice, Civil Rights

   Division, counsel for the United States;

2. Calderon, Tovah R., U.S. Department of Justice, Civil Rights

   Division, counsel for the United States;

3. Clarke, Kristen, U.S. Department of Justice, Civil Rights Division,

   counsel for the United States.

The United States certifies that no publicly traded company or corporation

has an interest in the outcome of this appeal.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  March 20, 2023

C-1 of 1

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ C-1

INTEREST OF THE UNITED STATES ................................................. 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE ............................................................... 2

    *1.*   *Statutory Background* ............................................................ 2

    *2.*   *Procedural History* ............................................................... 3

SUMMARY OF ARGUMENT ............................................................. 5

ARGUMENT

    I    SECTION 8(I) REQUIRES RELEASE OF RECORDS RESPONSIVE TO THE FELONY RECORDS REQUEST ............... 6

        *A.*   *Section 8(i) Covers Lists Of Those Prohibited From Registering Or Removed From The Rolls Due To Felony Convictions* ............................................................... 6

        *B.*   *The Secretary's Attempts To Limit 8(i)'s Scope Fail* ............... 13

    II   SECTION 8(I) REQUIRES ELECTRONIC RELEASE OF ELECTRONIC RECORDS WHEN NEEDED TO FACILIATE MEANINGFUL PUBLIC DISCLOSURE ................... 19

        *A.*   *All Traditional Tools Of Statutory Interpretation Support Requiring Electronic Release Of Records When Needed To Preserve Meaningful Disclosure* ........................... 20

**TABLE OF CONTENTS (continued):**                    **PAGE**

   *B.* *Providing Lists Of Applicants Or Registrants Affected*
     *By Covered Programs Or Activities Does Not*
     *Constitute Creating New Records*.............................................28

CONCLUSION .................................................................................. 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASES:**                                                                     **PAGE**

*Arcia* v. *Florida Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) ................. *passim*

*Belevich* v. *Thomas*, 17 F.4th 1048 (11th Cir. 2021),
    cert. denied, 142 S. Ct. 2754 (2022) ............................................................25

*Bellitto* v. *Snipes*, 935 F.3d 1192 (11th Cir. 2019) ............................... 2, 10, 12, 27

*Bowling* v. *United States Bank Nat'l Ass'n*, 963 F.3d 1030 (11th Cir. 2020) .........22

*Campaign Legal Ctr.* v. *Scott*, No. 1:22-cv-92,
    2022 WL 3221301 (W.D. Tex. Aug. 2, 2022),
    rev'd and remanded on other grounds,
    49 F.4th 931 (5th Cir. 2022) ...........................................................................27

*Center for Investigative Reporting* v. *United States Dep't of Just.*,
    14 F.4th 916 (9th Cir. 2021) ..................................................................... 28-29

*Country Vintner of N.C., LLC* v. *E. & J. Gallo Winery, Inc.*,
    718 F.3d 249 (4th Cir. 2013) ...........................................................................21

*In re Ricoh Co., Ltd. Pat. Litig.*, 661 F.3d 1361 (Fed. Cir. 2011) ..........................21

*Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011) ..............19

*Kodadek* v. *MTV Networks, Inc.*, 152 F.3d 1209 (9th Cir. 1998) ...........................22

*Laperriere* v. *Vesta Ins. Grp., Inc.*, 526 F.3d 715 (11th Cir. 2008) ...................8, 12

*May* v. *Department of Air Force*, 800 F.2d 1402 (5th Cir. 1986) ..........................28

*News-Press* v. *United States Dep't of Homeland Sec.*,
    489 F.3d 1173 (11th Cir. 2007) .......................................................................25

*Project Vote, Inc.* v. *Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) ................ 28-29

*Project Vote/Voting for Am., Inc.* v. *Long*, 682 F.3d 331 (4th Cir. 2012) ..... *passim*

**CASES (continued):**                                              **PAGE**

*Public Int. Legal Found., Inc.* v. *Matthews*,
    589 F. Supp. 3d 932 (C.D. Ill. 2022) ..................................................... 22, 27

*Public Int. Legal Found., Inc.* v. *North Carolina State Bd. of Elections*,
    996 F.3d 257 (4th Cir. 2021) ..................................................... 9-10

*Race Tires Am., Inc.* v. *Hoosier Racing Tire Corp.*, 674 F.3d 158 (3d Cir.),
    cert. denied, 568 U.S. 825 (2012) .................................................... 21

*United States* v. *Ballinger*, 395 F.3d 1218 (11th Cir.) (en banc),
    cert. denied, 546 U.S. 829 (2005) ......................................... 25-26

*United States* v. *Bryant*, 996 F.3d 1243 (11th Cir.),
    cert. denied, 142 S. Ct. 583 (2021) ................................................. 10

*United States* v. *Hastie*, 854 F.3d 1298 (11th Cir. 2017) ........................................ 17

*United States* v. *Mead Corp.*, 533 U.S. 218 (2001) ................................................. 18

*United States ex rel. Feingold* v. *AdminaStar Fed., Inc.*,
    324 F.3d 492 (7th Cir. 2003) .......................................................... 22

*United States ex rel. Williams* v. *NEC Corp.*,
    931 F.2d 1493 (11th Cir. 1991) ............................................. 22-23

*United States ex rel. Wilson* v. *Graham Cnty. Soil & Water Conservation Dist.*,
    777 F.3d 691 (4th Cir. 2015) .......................................................... 22

*Villarreal* v. *R.J. Reynolds Tobacco Co.*, 839 F.3d 958 (11th Cir. 2016)
    (en banc), cert. denied, 137 S. Ct. 2292 (2017) ............................................. 21

*Voting for Am., Inc.* v. *Andrade*, 488 F. App'x 890 (5th Cir. 2012) ...................... 25

**STATUTES:**

Freedom of Information Act
    5 U.S.C. 552(a)(2) ........................................................................ 24
    5 U.S.C. 552(a)(3) ........................................................................ 24

**STATUTES (continued):**                                           **PAGE**

Help America Vote Act
    52 U.S.C. 21083(a)(1)(A) ........................................ 3, 16, 23
    52 U.S.C. 21085 .................................................. 29
    52 U.S.C. 21145(a) ............................................. 24
    Pub. L. No. 107-252, § 802, 116 Stat. 1726 ................. 14

National Voter Registration Act
    52 U.S.C. 20501(a) ............................................. 2
    52 U.S.C. 20501(b) .......................................... 12-13
    52 U.S.C. 20501(b)(4) ........................................ 12
    52 U.S.C. 20504(e) ........................................... 13
    52 U.S.C. 20506(d) ........................................... 13
    52 U.S.C. 20507 ............................................. 2, 10
    52 U.S.C. 20507(a)(1) ........................................ 11
    52 U.S.C. 20507(a)(2) ........................................ 13
    52 U.S.C. 20507(a)(3) ........................................ 16
    52 U.S.C. 20507(a)(4) ........................................ 16
    52 U.S.C. 20507(b) .......................................... 11, 15
    52 U.S.C. 20507(b)(1) ........................................ 11
    52 U.S.C. 20507(c) ........................................... 13
    52 U.S.C. 20507(c)(2) ........................................ 16
    52 U.S.C. 20507(c)(2)(A) ..................................... 11
    52 U.S.C. 20507(d) ........................................... 9
    52 U.S.C. 20507(g) ......................................... 7-8, 16
    *52 U.S.C. 20507(i) ...................................... *passim*
    *52 U.S.C. 20507(i)(1) ................................... *passim*
    52 U.S.C. 20507(i)(2) ........................................ 17
    52 U.S.C. 20510(a) ........................................... 1
    52 U.S.C. 20510(b)(2) ........................................ 20
    Pub. L. No. 103-31, § 9(a), 107 Stat. 87 ................... 14, 18

Ala. Code § 17-3-30 (2022) ......................................... 7

Ala. Code § 17-3-30.1(c) (2022) .................................... 7

Ala. Code § 17-3-54 (2022) ......................................... 7

Ala. Code § 17-4-3(a) (2022) ....................................... 7

**RULE:**                                          **PAGE**

Fed. R. App. P. 29(a) ...................................................................1

**MISCELLANEOUS:**

*American Heritage Dictionary of the English Language* (3d ed. 1992) ................21

*Oxford English Dictionary* (2d ed. 1989),
      https://www.oed.com/oed2/00118155.........................................................20

*Webster's Third New International Dictionary* (1993) ................................. 7, 20-21

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 22-13708

GREATER BIRMINGHAM MINISTRIES,

Plaintiff-Appellee

v.

SECRETARY OF STATE FOR THE STATE OF ALABAMA,

Defendant-Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING PLAINTIFF-APPELLEE AND URGING AFFIRMANCE
ON THE ISSUES ADDRESSED HEREIN

_____

**INTEREST OF THE UNITED STATES**

This case raises important interpretive issues regarding Section 8(i) of the

National Voter Registration Act (NVRA), 52 U.S.C. 20507(i).  The Attorney

General is charged with enforcing the NVRA.  52 U.S.C. 20510(a).  Accordingly,

the United States has an interest in ensuring that Section 8(i) is correctly construed.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

**STATEMENT OF THE ISSUES**

The United States addresses the following questions:

1.  Whether Section 8(i) requires disclosure of records concerning people denied registration, or removed from a State's voter rolls, because of disqualifying felony convictions.

2.  Whether Section 8(i) requires States to release electronic copies of records when the records are maintained electronically and failure to release such information in electronic form would unduly interfere with Section 8(i)'s disclosure right.[1]

## STATEMENT OF THE CASE

*1.    Statutory Background*

In 1993, "against the backdrop of waning election participation," Congress "adopted the National Voter Registration Act." *Bellitto* v. *Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019).  Congress determined that the right to vote "is a fundamental right," the exercise of which government has a duty to promote, and that "unfair registration laws and procedures" can reduce participation in federal elections and "disproportionately harm voter participation by various groups, including racial minorities."  52 U.S.C. 20501(a).

Section 8 of the NVRA, titled "[r]equirements with respect to administration of voter registration," establishes uniform procedures to increase voter registration in federal elections while maintaining accurate voter rolls.  52 U.S.C. 20507.  This

---

[1]  The United States takes no position on any issue not addressed herein.

case concerns Section 8(i), titled "[p]ublic disclosure of voter registration

activities." 52 U.S.C. 20507(i). Section 8(i) creates a right to access records

related to States' registration and voter-roll maintenance efforts. The relevant

portion provides:

> Each State shall maintain for at least 2 years and shall make available
> for public inspection and, where available, photocopying at a
> reasonable cost, all records concerning the implementation of
> programs and activities conducted for the purpose of ensuring the
> accuracy and currency of official lists of eligible voters, except to the
> extent that such records relate to a declination to register to vote or to
> the identity of a voter registration agency through which any
> particular voter is registered.

52 U.S.C. 20507(i)(1).

## 2.  *Procedural History*

a.  As required by the Help America Vote Act of 2002 (HAVA), 52 U.S.C.

21083(a)(1)(A), Alabama's Secretary of State (the Secretary) maintains the State's

voter-registration and voter-roll information in an electronic database called

PowerProfile. Doc. 90, at 6.[2] The Secretary at times creates and sells electronic

reports containing subsets of the information in the database, transferring them to

buyers by email or other electronic means. Doc. 90, at 6-7. Rather than using the

same electronic means to provide records requested under Section 8(i) of the

---

[2] "Doc. __ " refers to the docket entry of documents filed in the district
court, No. 2:22-cv-205 (N.D. Ala.). "Br. __" refers to the Secretary's opening
brief on appeal.

- 4 -

NVRA, the Secretary created a public inspection policy in response to this suit that requires NVRA requestors to view records on a computer in his office. Doc. 90, at 7. Viewers may access the computer no more than four hours a day; they may take limited notes, but may not engage in "word-for-word copying" or use flash drives to copy the information. Doc. 90, at 7-8 (citation omitted).

In 2021, plaintiff Greater Birmingham Ministries (GBM) sought several sets of records from the Secretary under Section 8(i). Doc. 90, at 4. It requested lists of (1) those removed from Alabama's voter rolls due to disqualifying felony convictions, (2) those denied registration due to disqualifying felony convictions, and (3) all those removed from the voter rolls, for any reason, after the 2020 general election. Doc. 90, at 4-5. (Following the parties, the United States refers to the first two requests jointly as the Felony Records Request and to the third as the Purged Voters Request.) The Secretary refused to provide records responsive to the Felony Records Request and sought to charge a one-cent-per-person fee for transmitting records responsive to the Purged Voters Request. Doc. 90, at 5.

b. After providing the statutorily-required notice, GBM sued the Secretary, alleging violations of Section 8(i) as to both requests. Doc. 90, at 2, 6. The case eventually proceeded to a bench trial. Doc. 90, at 3. After trial, the district court ruled for GBM. Doc. 90, at 2; see Doc. 113 (final judgment). It first held that records responsive to the Felony Records Request fell within Section 8(i). Doc.

90, at 9-17.  It then held that the Secretary must send its records to GBM in digital form.  Doc. 90, at 21.  Since GBM was willing to pay a reasonable fee for the electronic records, the court let the Secretary impose a fee to cover the actual costs of producing them.  Doc. 90, at 23-26.

c.  The Secretary turned over the requested records (Doc. 95, at 6-8), then timely appealed (Docs. 100, 114).

## SUMMARY OF ARGUMENT

The district court correctly held that the Felony Records Request sought records covered by Section 8(i).  Statutory text, context, purpose, and case law all establish that Section 8(i) covers both activities related to voter registration and activities regarding people with disqualifying felony convictions.  The Secretary argues the opposite, pointing to certain provisions of Section 8 and statements from the Federal Election Commission (FEC) and Department of Justice (DOJ).  But none of these sources supports his atextual and restrictive readings of Section 8(i).

Additionally, in circumstances like those here, Section 8(i) requires States to release responsive electronic information to requestors, rather than forcing them to examine thousands of records in person during limited hours without the ability to copy them.  Here, too, text, context, purpose, and precedent all support the district court's consistent interpretation.  When information is stored digitally, and failure

to release it electronically would unduly interfere with disclosure rights, Section 8(i)'s public-inspection and photocopying provisions require electronic release.

## ARGUMENT

## I

## SECTION 8(I) REQUIRES RELEASE OF RECORDS RESPONSIVE TO THE FELONY RECORDS REQUEST

A.   *Section 8(i) Covers Lists Of Those Prohibited From Registering Or Removed From The Rolls Due To Felony Convictions*

1.   The district court correctly held that Section 8(i) applies both to lists of those denied registration generally, and to lists of those denied registration or removed from the voting rolls due to felony convictions specifically.  The NVRA's language, structure, and purpose support this reading.

a.   "As in all cases involving statutory construction, our starting point must be the language employed by Congress."  *Arcia* v. *Florida Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014).  Section 8(i) requires disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1).  Lists of those denied registration or removed from the rolls due to felony convictions fall squarely within this language.

First, Alabama's efforts to deny registration to and remove from the voter rolls those with disqualifying felony convictions plainly constitute "programs" or

- 7 -

"activities."  52 U.S.C. 20507(i)(1).  A "program" is "a plan of procedure" or "schedule or system under which action may be taken toward a desired goal," while an "activity" is a "natural or normal function or operation."  *Webster's Third New International Dictionary* 22, 1812 (1993).  Alabama's efforts meet either definition.

Alabama law requires registrars to "purge" the State's voter list "on a continuous basis" of any registered voters who have "been convicted of" a disqualifying felony.  Ala. Code § 17-4-3(a) (2022).  It also authorizes registrars to "refuse[] registration" to any applicant "who fails to establish  *  *  *  that he or she is qualified to register," *id.* § 17-3-54, including if the applicant has been "disqualified to vote by reason of conviction of a felony involving moral turpitude," *id.* § 17-3-30.1(c); see *id.* § 17-3-30 (excluding those disqualified to vote from entitlement to register); see also 52 U.S.C. 20507(g) (requiring federal prosecutors to notify state election officials of federal felony convictions).  Each of these processes "is a 'program' because it is" a plan of procedure "carried out in the service of a specified end—maintenance of voter rolls."  *Project Vote/Voting for Am., Inc.* v. *Long*, 682 F.3d 331, 335 (4th Cir. 2012) (*Project Vote*); see also *Arcia*, 772 F.3d at 1339 (discussing "two separate *programs* to identify and remove non-citizens from the Florida voter rolls" (emphasis added)).  And each "is an 'activity' because it is a particular task and deed of [Alabama] election

- 8 -

employees," a normal operation for which they are responsible. *Project Vote*, 682 F.3d at 335.

Second, these registration-denial and list-maintenance programs are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Alabama's removal requirement eliminates those who erroneously were registered despite existing convictions, thereby ensuring the list's "accuracy," or who once were but no longer are eligible voters, thereby ensuring its "currency." *Ibid.* Likewise, "the process of reviewing voter registration applications keeps official voter lists both 'accurate'—free from error—and 'current'—most recent." *Project Vote*, 682 F.3d at 335.

Third, lists of voters denied or removed by Alabama's felony programs are "records concerning the implementation of" those programs. 52 U.S.C. 20507(i)(1). They are records of the end result of each program, and therefore "concern"—or relate to—how those programs are "implement[ed]." *Ibid.* Moreover, the NVRA applies its disclosure requirement to "*all*" such "records," *ibid.* (emphasis added), a word that gives the provision a "'broad,' 'powerful,' and 'expansive' meaning." *Laperriere* v. *Vesta Ins. Grp., Inc.*, 526 F.3d 715, 726 (11th Cir. 2008) (citations omitted). Lists of those denied a place on or removed from the voter rolls fall within the "broad range of disclosable documents" covered by

Section 8(i).  *Public Int. Legal Found., Inc.* v. *North Carolina State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021).

Finally, such lists are not among the only two categories of records excluded from Section 8(i)'s reach:  those that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered."  52 U.S.C. 20507(i)(1).  As "Congress explicitly enumerate[d] certain exceptions" to Section 8(i), the Secretary cannot invent an "additional," "implied" exception for records of registration denials or for records related only to persons convicted of disqualifying felonies.  *Arcia*, 772 F.3d at 1345 (citation omitted) (examining NVRA Section 8(c)(2)).  Moreover, that Congress needed explicitly to exclude two categories of records relating to voter registration confirms that Section 8(i) otherwise reaches such records.

The only appeals court to address similar issues has read Section 8(i)'s text the same way.  In *Project Vote*, the Fourth Circuit held that "the plain language of Section 8(i)(1) does not allow us to treat its disclosure requirement as limited to voter removal records" and that "completed voter registration applications are clearly" covered.  682 F.3d at 335.  Following the same "statutory analysis," the Fourth Circuit also has held that a State's "efforts  *  *  *  to identify noncitizen registrants" and remove them from the rolls "qualify as a 'program' or 'activity' to ensure an accurate list of eligible voters" and that records related to those efforts

- 10 -

therefore "fall within the scope of the NVRA's disclosure provision." *Public Int. Legal Found.*, 996 F.3d at 266 (quoting 52 U.S.C. 20507(i)(1)).[3]  In both cases, the Fourth Circuit recognized that "the statute's use of the term 'all records' relating to [a State's] 'implementation of' the program or activity * * * encompasses a broad range of disclosable documents." *Ibid.*; see *Project Vote*, 682 F.3d at 336.

    b.  Statutory context further shows that Section 8(i) covers information responsive to the Felony Records Request.  See *Bellitto* v. *Snipes*, 935 F.3d 1192, 1200 (11th Cir. 2019) (interpreting NVRA Section 8(a)(4) with reference to "statutory structure").  Start with the relevant statutory titles, which "are 'permissible indicators of meaning.'"  *United States* v. *Bryant*, 996 F.3d 1243, 1258 (11th Cir.) (citation omitted), cert. denied, 142 S. Ct. 583 (2021).  Section 8(i) is titled "Public disclosure of voter *registration* activities," 52 U.S.C. 20507(i) (emphasis added), and falls within a section titled "[r]equirements with respect to administration of voter *registration*," 52 U.S.C. 20507 (emphasis added).  "These statutory labels reinforce the conclusion that Section 8(i)(1) governs voter registration records." *Project Vote*, 682 F.3d at 337.  When Congress sought to reference only efforts to remove voters from the rolls, it titled those provisions accordingly.  Compare, *e.g.*, 52 U.S.C. 20507(c) ("Voter removal programs"); 52

---

[3]  While *Public Interest Legal Foundation* dealt with removals for non-citizenship, nothing in Section 8(i) distinguishes between removal programs based on the reason for removal.  See pp. 12, 16-17, *infra*.

U.S.C. 20507(d) ("Removal of names from voting rolls"), with 52 U.S.C. 20507(b) ("Confirmation of voter registration").

Congress likewise specified throughout Section 8's text when provisions are limited only to list-maintenance activities. For instance, Section 8(c) sets time limits for completing "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A). This language refers only to programs designed to cull already-registered voters from the rolls. See *Arcia*, 772 F.3d at 1348. By contrast, Section 8(a) lists requirements for States "[i]n the administration of voter *registration* for elections for Federal office," including both measures to "ensure that any eligible applicant *is registered to vote* in an election" and "a general program" to remove ineligible registered voters from the rolls. 52 U.S.C. 20507(a)(1) and (4) (emphases added). And in Section 8(b), Congress set standards for "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office." 52 U.S.C. 20507(b)(1). This language, like Section 8(i)'s, applies to *all* programs or activities designed to "ensur[e] the accuracy and currency of official lists of eligible voters," 52 U.S.C. 20507(i)(1), which includes denying registration to those ineligible to vote. See

*Laperriere*, 526 F.3d at 726 (describing the word "any" and stating it "means 'all'" (citations omitted)).

Congress also specified when a particular NVRA provision applies only to removals of those deemed ineligible for particular reasons. Section 8(a)(4), for example, requires States to implement "a 'general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of' only two things:  death or change of address." *Bellitto*, 935 F.3d at 1200 (quoting 52 U.S.C. 20507(a)(4)).  It is presumed that "when Congress uses different language in similar sections, it intends different meanings." *Ibid.* (citation omitted).  If Congress wanted to limit Section 8(i)'s disclosure mandate to list-maintenance programs, or to excise programs related to felony convictions from Section 8(i)'s reach, Congress knew how to do so.

    c.  Since Section 8(i)'s "language is plain and unambiguous," it is unnecessary "to examine statutory purpose." *Bellitto*, 935 F.3d at 1201.  But disclosure of records responsive to the Felony Records Request plainly would advance all of the NVRA's purposes:  increasing eligible voter registration, enhancing voter participation, protecting electoral integrity, and maintaining current and accurate voter registration rolls.  See 52 U.S.C. 20501(b).  Whether "voter registration rolls" are "accurate and current," 52 U.S.C. 20501(b)(4), can only be determined by examining records related to *all* the bases on which a State

denies registration or removes registrants.  Public inspection of records related to

denials or removals, whatever the reason for them, ensures that States are properly

evaluating applications, rejecting applicants only for legitimate reasons, processing

eligible applications in a timely fashion, notifying applicants of the disposition of

their applications, and engaging in uniform and nondiscriminatory registration and

list-maintenance practices.  See, *e.g.*, 52 U.S.C. 20504(e); 52 U.S.C. 20506(d); 52

U.S.C. 20507(a)(1)-(2) and (b)(1).  Inspection of such records also may help

uncover systemic problems in a jurisdiction, so voters (or organizations like GBM)

can remedy registration and list-maintenance issues before future elections.  Public

disclosure of those denied registration or removed from the rolls for felony

convictions thus advances the NVRA's central purposes:  increasing registration

and participation, maintaining voter-roll accuracy, and ensuring the electoral

process's integrity.  52 U.S.C. 20501(b).

B.      *The Secretary's Attempts To Limit 8(i)'s Scope Fail*

1.  As discussed above, Section 8(i) does not distinguish between voter

registration records and list-maintenance records.  Nevertheless, the Secretary

relies (Br. 39-41, 46-49) on statements from the FEC and DOJ that he claims

support carving out registration records from Section 8(i)'s reach.  They do no

such thing.

The Secretary first points to a 1994 FEC guidance document. See Br. 39-41, 47-49; Doc. 79-1. He notes that the guidance describes Section 8's scope with phrases like "list maintenance" and "list cleaning" and discusses "improper *removals*." Br. 39, 41. But the FEC's choice of shorthand sheds no light on Section 8(i)'s precise meaning. See also Doc. 79-1, at 10 (stressing in the guidance document that the FEC "does *not* have legal authority either to interpret the Act or to determine whether this or that procedure meets [its] requirements," and cautioning that "[a]ny suggestions contained in this document are purely heuristic").[4]

The Secretary also points to an NVRA Question and Answer page on DOJ's website. See Br. 39-40, 46; Doc. 79-4. In response to the question, "Under the NVRA, what are the circumstances under which a State can remove a person's name from the voter registration rolls?," the web page describes the circumstances under which Section 8 either allows or requires States to remove certain registrants from the voter rolls. Doc. 79-4, at 7-8. The Q&A page explains that the NVRA "requires States to conduct a general voter registration list maintenance program

---

[4] The NVRA initially granted the FEC authority to promulgate rules implementing certain aspects of the statute—though not Section 8(i). See Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (as amended 52 U.S.C. 20508(a)). HAVA transferred the FEC's functions and powers under the NVRA to the Election Assistance Commission. See Pub. L. No. 107-252, § 802, 116 Stat. 1726 (52 U.S.C. 20508(a)).

- 15 -

that makes a reasonable effort to remove ineligible persons from the voter rolls by reason of" their death or change of residence, that this "program" must be carried out in accordance with the NVRA's procedures, and that it "must be uniform, nondiscriminatory and in compliance with the Voting Rights Act." Doc. 79-4, at 8. The nondiscrimination requirement, found in Section 8(b)(1), applies to "[a]ny State program or activity to protect the integrity of the electoral process." 52 U.S.C. 20507(b).

DOJ's answer says nothing whatsoever about a State's obligations under the NVRA's disclosure provision. The Secretary posits that DOJ must have interpreted Section 8(b)(1)'s reference to "program[s] or activit[ies]" as being limited *solely* to "list maintenance" rather than voter registration activities, and argues that Section 8(i) must be read the same way. Br. 40. But the Q&A page makes no such logical leap, which would contradict the plain meaning of both Section 8(b)(1) and Section 8(i). See pp. 11-12, *supra*. Moreover, the statement to which the Secretary points says nothing either way about voter registration. It answers a question solely about, and so focuses solely on, voter removals. Doc. 79-4, at 7-8. When speaking directly to Section 8(i), the Q&A page confirms that voter registration records are subject to that provision. See Doc. 79-4, at 10 ("Are States required to keep records of their voter registration activities under the NVRA? Yes.").

2.  The Secretary also claims that Section 8(i) does not cover records of those with felony convictions at all, even in relation to voter removals.  But see pp. 6-9, 12, *supra*.  He emphasizes (Br. 41, 45 & n.17) that actions to remove voters for disqualifying felonies are exempted from a different NVRA provision, which forbids using systemic list-maintenance programs within 90 days of a federal election.  See 52 U.S.C. 20507(c)(2).  But while this language illustrates "that not all ineligibility is treated the same" under *that* provision (Br. 45), it says nothing about the text of Section 8(i).  Section 8(i) applies to "*all* records concerning the implementation of" covered programs, with only two exceptions not applicable here.  52 U.S.C. 20507(i)(1) (emphasis added).  And Congress expressly contemplated State programs to remove voters for criminal convictions:  It allowed the practice, 52 U.S.C. 20507(a)(3)(B), and facilitated removals for federal convictions, 52 U.S.C. 20507(g), but has since required States to "coordinate the computerized [voter] list with State agency records on felony status" before removing voters, 52 U.S.C. 21083(a)(2)(A)(ii)(I).

The Secretary likewise claims (Br. 44-46) that, because Section 8(a)(4) of the NVRA requires States to conduct programs to remove those who changed addresses or died, see 52 U.S.C. 20507(a)(4), Section 8(i) applies only to those required programs.  But Section 8(i)'s text cannot be read to tether disclosure to those programs alone.  "If Congress wanted such a limited result, it could have said

- 17 -

so." *Arcia*, 772 F.3d at 1348. While Section 8(a)(4) is expressly restricted to death and change of address, Section 8(i) applies to *all* records about implementation of programs "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Section 8(i) also reaches both "programs *and activities*," 52 U.S.C. 20507(i)(1) (emphasis added), further indicating a broad sweep. It is not limited to Section 8(a)(4) programs.

The Secretary also relies (Br. 44-45) on the disclosure provision's second paragraph, Section 8(i)(2). This paragraph specifies that States must maintain certain records about confirmation-of-address mailings sent as part of Section 8(a)(4) programs, but does not mention removals for felony convictions. 52 U.S.C. 20507(i)(2). Section 8(i)(2), however, is not limited to its examples. It states that "[t]he records maintained pursuant to paragraph (1) shall *include*" the enumerated records. *Ibid.* (emphasis added). And "the word *include* does not ordinarily introduce an exhaustive list." *United States* v. *Hastie*, 854 F.3d 1298, 1304 (11th Cir. 2017) (citation omitted). Limiting Section 8(i) "to only the enumerated examples" in Section 8(i)(2) also "would render the express exclusions [in Section 8(i)(1)] superfluous." *Ibid.* Thus, Section 8(i)(2) merely clarifies certain categories of information that must be maintained; it does not exclude other records. See *Project Vote*, 682 F.3d at 337.

- 18 -

3.  Finally, the Secretary asserts (Br. 47-49) that, even if Section 8(i) applies to removals for felony convictions, it does not reach *lists* of those removed.  For this argument, the Secretary relies principally on a passage in the 1994 FEC guidance.  This passage quotes Section 8(i)(2)'s language about what the records subject to disclosure must include.  Doc. 79-1, at 88-89, 140.  The passage then says that States might also wish to retain "for the same period of time all records of removals from the voter registration list," but "[a]s a matter of prudence, not as a requirement of the Act."  Doc. 79-1, at 89, 140.

This statement cannot sustain the Secretary's interpretation.  To start, the FEC's guidance is just that:  guidance.  The FEC's rulemaking authority never extended to the NVRA's public disclosure provision, see Pub. L. No. 103-31, § 9(a), 107 Stat. 87 (as amended 52 U.S.C. 20508(a)), so it never could issue binding pronouncements on the subject, see *United States* v. *Mead Corp.*, 533 U.S. 218, 231-232 (2001).  In any event, the statement's placement after discussion of Section 8(i)(2) suggests that the FEC may have believed that *only* those records specified in Section 8(i)(2) must be retained and disclosed—a reading that would run afoul of the statutory text.  See p. 17, *supra*.  If so, the FEC's mistaken interpretation of Section 8(i) could not overcome the statute's clear language.  See *Villarreal* v. *R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 970 (11th Cir. 2016) (en banc), cert. denied, 137 S. Ct. 2292 (2017).  As the Secretary notes, however, the

- 19 -

guidance "does not explain" its statement.  Br. 47.  It therefore can provide no

basis for interpreting Section 8(i)—and certainly not for misinterpreting it.

## II

## SECTION 8(I) REQUIRES ELECTRONIC RELEASE OF ELECTRONIC RECORDS WHEN NEEDED TO FACILIATE MEANINGFUL PUBLIC DISCLOSURE

The district court also reasonably held that the NVRA required the Secretary

to transmit information to GBM digitally.  See Doc. 90, at 17-18.  Section 8(i)

requires States to "make [all covered records] available for public inspection and,

where available, photocopying at a reasonable cost."  52 U.S.C. 20507(i)(1).

"[I]nterpretation of this [language] 'depends upon reading the whole statutory text,

considering the purpose and context of the statute, and consulting any precedents

or authorities that inform the analysis.'"  *Kasten* v. *Saint-Gobain Performance*

*Plastics Corp.*, 563 U.S. 1, 7 (2011) (citation omitted).  Considered together, text,

context, purpose, and case law support requiring States to release information

electronically to requestors where the information already is stored digitally and

failure to release the information electronically would impede meaningful

disclosure.  The Secretary cannot circumvent Section 8(i)'s requirements by

erroneously claiming that meeting GBM's requests involves creating new records.

A.    *All Traditional Tools Of Statutory Interpretation Support Requiring Electronic Release Of Records When Needed To Preserve Meaningful Disclosure*

1.  The Secretary's restrictive disclosure regime impedes the rights Section 8(i) affords.  Section 8(i) mandates that States allow "public inspection" of records. "Inspection" means "looking narrowly into; careful scrutiny or survey; close or critical examination."  *Oxford English Dictionary* (2d ed. 1989), https://www.oed.com/oed2/00118155; accord *Webster's Third New International Dictionary* 1170 (1993) (defining "inspection" as "a strict or close examination"). Section 8(i) thus requires States to provide records in a manner that enables the public to subject those records to close examination.  And the NVRA provides district courts with flexibility to tailor the remedy to the circumstances of the infringement, allowing plaintiffs to receive "declaratory or injunctive relief *with respect to the violation  \* \* \*  in addition to all other rights and remedies provided by law*."  52 U.S.C. 20510(b)(2) and (d)(1) (emphasis added).  Here, "where the records are already kept in digital form"—and where the number of records involved and the timing and notetaking strictures imposed by the Secretary's physical inspection policy would make in-person examination prohibitively burdensome, thereby "unduly interfer[ing] with the NVRA's express purposes"—Section 8(i) mandates some other meaningful opportunity to inspect.

Doc. 90, at 21.  Absent a lawful State-sponsored alternative, the district court reasonably required electronic transmission of the information sought.

Section 8(i)'s photocopying mandate also requires electronic release of electronic documents in like circumstances.  To "photocopy" is simply "[t]o make a photographic reproduction of (printed or graphic material)."  *The American Heritage Dictionary of the English Language* 1363 (3d ed. 1992); accord *Webster's Third* 1702 (defining "photocopy" as "a negative or positive photographic reproduction of graphic matter (as a drawing or printing)").  Courts often have read statutory discussions of copying as including electronic production of material.  For instance, "[i]n the era of electronic discovery, courts have held that electronic production of documents can constitute 'exemplification' or 'making copies' under" the federal costs statute.  *In re Ricoh Co., Ltd. Pat. Litig.*, 661 F.3d 1361, 1365 (Fed. Cir. 2011); see also *Race Tires Am., Inc.* v. *Hoosier Racing Tire Corp.*, 674 F.3d 158, 171 n.11 (3d Cir.) (stating that "the costs of conversion to an agreed-upon production format are taxable as the functional equivalent of 'making copies'"), cert. denied, 568 U.S. 825 (2012); *Country Vintner of N.C., LLC* v. *E. & J. Gallo Winery, Inc.*, 718 F.3d 249, 260 (4th Cir. 2013) (allowing taxation under costs statute for "converting electronic files to non-editable formats, and burning the files onto discs").  And "a photocopy or *other electronic means of reproduction* of an original drawing could" constitute a "bona

- 22 -

fide cop[y]" under the copyright statute.  *Kodadek* v. *MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (citation omitted; emphasis added).

So too here.  Electronic release, "where available," fits within Section 8(i). 52 U.S.C. 20507(i)(1).  Indeed, as records are increasingly kept electronically, not requiring electronic release would functionally read the copying provision out of Section 8(i).  At the very least, a State's refusal to allow NVRA requestors to copy records themselves, when the means of such copying are readily available via flash drive, phone camera, or email, violates the photocopying provision.  See *Public Int. Legal Found., Inc.* v. *Matthews*, 589 F. Supp. 3d 932, 943 (C.D. Ill. 2022).

2.  The disclosure provision's "caption  *  *  *  also bolsters [this] textual analysis."  *Bowling* v. *United States Bank Nat'l Ass'n*, 963 F.3d 1030, 1038 (11th Cir. 2020).  Section 8(i) is entitled "[p]ublic disclosure of voter registration activities."  52 U.S.C. 20507(i).  The word "'[d]isclosure' requires an affirmative act" to hand over records, and "[b]y specifying that a 'disclosure' must be 'public,' Congress indicated that only disclosures made to the public at large or to the public domain" meet the statute's requirements.  *United States ex rel. Wilson* v. *Graham Cnty. Soil & Water Conservation Dist.*, 777 F.3d 691, 696 (4th Cir. 2015) (False Claims Act case); see *United States ex rel. Feingold* v. *AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003) (defining "public disclosure" similarly in FCA case); see also *United States ex rel. Williams* v. *NEC Corp.*, 931 F.2d 1493, 1500 n.11

(11th Cir. 1991) (rejecting idea in FCA case that documents in hands of one person were "disclosed to the 'public'").  In an age of email and internet-based communication, public disclosure means electronic release of electronic information—not closeting a computer in an office and forcing requestors to travel hundreds of miles to view voluminous records for brief intervals with no opportunity to copy the information.[5]

3.  Likewise, reading Section 8(i) to require electronic release of electronic documents best harmonizes the provision with HAVA.  HAVA mandated that each State create "a single, uniform, official, centralized, interactive computerized statewide voter registration list," which must "serve as the single system for storing and managing the official list of registered voters throughout the State."  52 U.S.C. 21083(a)(1)(A)(i); see also 52 U.S.C. 21083(a)(2)(A)(ii)(I) (requiring that States that remove voters from the list due to disqualifying felonies "coordinate the computerized list with State agency records on felony status").

---

[5]  The Secretary argues that, because other statutes specify locations or times at which public inspection must occur, the phrase "public inspection" always means that "the inspector goes to the records."  Br. 28.  The district court came to the opposite conclusion.  Doc. 90, at 22-23.  The United States takes no position on the meaning of any other public inspection statute.  However, the Secretary cannot rely on *different* language from *other* statutes (Br. 27, 29-30) to argue that Section 8(i) must refer only to physical inspection, while also arguing that Section 8(i) cannot be interpreted to require electronic release of records because the provision *lacks* language similar to that found in the Freedom of Information Act (FOIA) and other statutes (see note 6, *infra*).

Congress provided that none of HAVA's requirements, including its digitization of registration records, "may be construed to * * * supersede, restrict, or limit the application" of the NVRA.  52 U.S.C. 21145(a) and (a)(4). Yet if the Secretary's interpretation of Section 8(i) were correct, HAVA would have fundamentally altered the way in which NVRA records are kept while silently restricting the public's ability to benefit from the change.  By contrast, reading Section 8(i) to impose a general public disclosure requirement (as its plain text suggests) would fully maintain Section 8(i)'s consistency with HAVA, allowing for continued physical inspection of physical records and electronic release of records that HAVA required to be digitized.[6]

4.  Section 8(i)'s pro-disclosure purpose resolves any debate:  The statute's text is best understood as requiring electronic release of electronic information

---

[6]  That Congress amended FOIA to require electronic disclosure, but did not similarly amend Section 8(i) when enacting HAVA, does not mean that Section 8(i) must refer only to physical inspection of records.  Contra Br. 29-30. Congress's changes to FOIA go much further than Section 8(i)'s disclosure requirement.  Congress amended FOIA's affirmative public-inspection provision to require that *all* covered records be placed in "electronic format," and that *all* such records created "on or after November 1, 1996" be made available "by computer telecommunication" or "other electronic means."  5 U.S.C. 552(a)(2).  Likewise, Congress amended FOIA to require agencies to provide all other records "in any form or format requested by the person" if "readily reproducible."  5 U.S.C. 552(a)(3).  By contrast, Section 8(i) does not require States to digitize their physical records and provide them in electronic form.  But where records are already digital, Section 8(i) is best read to require States to release the information to requestors when that is necessary to enable meaningful examination.

where, as here, physical inspection regimes would overly burden the statute's disclosure right. "[S]tatutory language must be read in the context of the purpose it was intended to serve." *United States* v. *Ballinger*, 395 F.3d 1218, 1237 (11th Cir.) (en banc), cert. denied, 546 U.S. 829 (2005). And "[t]he entire purpose of [Section 8(i)] is to facilitate public inspection of public records." *Voting for Am., Inc.* v. *Andrade*, 488 F. App'x 890, 902 (5th Cir. 2012). Like FOIA, Section 8(i) "evidences a strong public policy in favor of public access to information," and "the policy of the Act requires that the disclosure requirements be construed broadly." *News-Press* v. *United States Dep't of Homeland Sec.*, 489 F.3d 1173, 1191 (11th Cir. 2007) (citations and quotation marks omitted). Reading Section 8(i) to require providing electronic records to requestors in cases like this one best fulfills the provision's purpose. By contrast, under the Secretary's reading of Section 8(i), States may implement unduly restrictive inspection regimes, contrary to the NVRA's plain intent to make records easily available to the public. "As between two competing interpretations, we must favor the 'textually permissible interpretation that furthers rather than obstructs' the statute's purposes." *Belevich* v. *Thomas*, 17 F.4th 1048, 1053 (11th Cir. 2021) (citation omitted), cert. denied, 142 S. Ct. 2754 (2022).

The regime the Secretary instituted in response to this suit does not provide a meaningful opportunity to examine the information to which GBM was entitled.

Rather than simply releasing the requested information to GBM electronically, the Secretary's policy would require GBM attorneys to travel to the Secretary's office, then sift through a spreadsheet of more than 159,000 responsive voter records. See Doc. 90, at 7; Doc. 95-1, at 3, 6 (describing number of records). Only one person at a time would be able to conduct this research, as the Secretary made available just a single computer terminal. Doc. 90, at 7. And that person would only be allowed to review the records for four hours a day, on days when the Secretary's office is open. Doc. 90, at 7.

Nor could GBM simply copy the records, which would both enable meaningful examination and use of the information and obviate the need for multiple trips. The Secretary forbade the use of flash drives, photos, or even "word-for-word copying" by hand. Doc. 90, at 7-8. And this is not the most extreme possible outcome: If the Secretary's interpretation of Section 8(i) were correct, he could have made the electronic voter list available for review for ten minutes once a month, in an office in the remotest corner of the State (or elsewhere), and fulfilled his duty under the statute. Such a myopic reading of Section 8(i)'s disclosure mandate language would "sever[] that [text] from its purpose, in contravention of the basic principle that the words of a statute are written to fill a purpose, not to fill a page." *Ballinger*, 395 F.3d at 1237.

Citing *Bellitto* v. *Snipes*, 935 F.3d 1192 (11th Cir. 2019), the Secretary questions any reliance on the NVRA's purposes.  Br. 31.  Certainly, the NVRA's "competing objectives"—encouraging access to the franchise and ensuring voter-roll accuracy—can find themselves "in some tension with each other" in some NVRA provisions.  *Bellitto*, 935 F.3d at 1201.  But Section 8(i)'s disclosure requirement serves all of the statute's principal goals, as well as its own more specific goal of enabling the public to monitor States' registration and list-maintenance activities.  See pp. 12-13, *supra*.  "It is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls," while also ensuring that voters' right to register and "exercise their franchise" is not "sacrificed to administrative chicanery, oversights, or inefficiencies."  *Project Vote/Voting for Am., Inc.* v. *Long*, 682 F.3d 331, 335, 339 (4th Cir. 2012).

5.  For these reasons, "[c]ourts addressing similar claims regularly presume that meaningful public disclosure entails electronic production of the documents at issue."  *Campaign Legal Ctr.* v. *Scott*, No. 1:22-cv-92, 2022 WL 3221301, at *6 (W.D. Tex. Aug. 2, 2022) (citing cases), rev'd and remanded on other grounds, 49 F.4th 931 (5th Cir. 2022); see also *Matthews*, 589 F. Supp. 3d at 943 (C.D. Ill. 2022) (holding that state law's "limitation on photocopying or duplication" of the statewide electronic voter registration list "is preempted by the NVRA").  By

contrast, the Secretary points to no decision that has adopted his crabbed

interpretation of Section 8(i).

B.    *Providing Lists Of Applicants Or Registrants Affected By Covered Programs
      Or Activities Does Not Constitute Creating New Records*

Taking a different tack, the Secretary also asserts (Br. 49-51) that requiring

him to locate records responsive to GBM's requests and provide lists of affected

voters would constitute record creation rather than maintenance.  This argument

gets him no further.  "[U]sing a query to search for and extract a particular

arrangement or subset of data already maintained in an agency's database does not

amount to the creation of a new record."  *Center for Investigative Reporting* v.

*United States Dep't of Just.*, 14 F.4th 916, 938 (9th Cir. 2021) (FOIA case).  While

responding to GBM's requests requires the Secretary to pull existing data from the

PowerProfile database, such requirements do not equate to the creation of new

records under federal disclosure principles.  See, *e.g.*, *id.* at 938-939 (quoting

cases); *May* v. *Department of Air Force*, 800 F.2d 1402, 1403 (5th Cir. 1986)

(holding that "requiring [an agency] to prepare a special form does not require it to

'create new records'" under Privacy Act when the requester "has not requested the

[agency] to produce information contained outside existing agency records").

Any "technical burdens in making the records available" do "not change that

the Requested Records are preserved accounts of information or evidence of past

events" that must be maintained and disclosed under Section 8(i).  *Project Vote,*

*Inc.* v. *Kemp*, 208 F. Supp. 3d 1320, 1336 (N.D. Ga. 2016). Were it otherwise,

Section 8(i) "would allow States to circumvent their NVRA disclosure obligations

simply by choosing to store information in a particular manner" or by making

information intentionally difficult for requestors to retrieve. *Ibid.* This concern is

heightened since HAVA required States to maintain their voter registration records

in a single electronic database but left to States' discretion "[t]he specific choices

on the methods of complying with" that requirement. 52 U.S.C. 21085. If "the

results of a search query run across a database necessarily constituted the creation

of a new record, we may well render [Section 8(i)] a nullity in the digital age."

*Center for Investigative Reporting*, 14 F.4th at 939; accord *Kemp*, 208 F. Supp. 3d

at 1336.

## CONCLUSION

This Court should affirm on the issues addressed herein.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Noah B. Bokat-Lindell
TOVAH R. CALDERON
NOAH B. BOKAT-LINDELL
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-0243

## CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS

AMICUS CURIAE SUPPORTING PLAINTIFF-APPELLEE AND URGING

AFFIRMANCE ON THE ISSUES ADDRESSED HEREIN:

(1)  complies with the type-volume limitation of Federal Rules of Appellate

Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,487 words, excluding the

parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

(2)  complies with the typeface requirements of Federal Rule of Appellate

Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate

Procedure 32(a)(6) because it has been prepared in a proportionally spaced

typeface using Word 2019, in 14-point Times New Roman font.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney

Date:  March 20, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2023, I electronically filed the foregoing

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE SUPPORTING

PLAINTIFF-APPELLEE AND URGING AFFIRMANCE ON THE ISSUES

ADDRESSED HEREIN with the Clerk of the Court for the United States Court of

Appeals for the Eleventh Circuit by using the appellate CM/ECF system.  All

participants are registered CM/ECF users and will be served by the appellate

CM/ECF system.

I further certify that four paper copies identical to the electronically filed

brief will be mailed to the Clerk of the Court by Federal Express.

s/ Noah B. Bokat-Lindell
NOAH B. BOKAT-LINDELL
 Attorney