[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13708

_____

GREATER BIRMINGHAM MINISTRIES,

Plaintiff-Appellee,

*versus*

SECRETARY OF STATE FOR THE STATE OF ALABAMA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:22-cv-00205-MHT-SMD

_____

Before GRANT, ABUDU, and HULL, Circuit Judges.

GRANT, Circuit Judge:

More than thirty years ago, the National Voter Registration Act required states to adopt a wide variety of policies designed to increase both voter participation and election integrity. The disclosure provision of that Act serves both goals by granting voters transparency into a state's voter registration practices. *See* 52 U.S.C. § 20507(i). Greater Birmingham Ministries invoked the public disclosure provision when it sought electronic production of several voter lists, including records of individual felons disqualified from voting by Alabama. This appeal asks whether those records fall within the Act's disclosure provision, whether they must be produced electronically, and, if so, whether the Act limits the price Alabama can charge.

The public disclosure provision squarely covers the records Greater Birmingham Ministries seeks. These felon disqualification records concern Alabama's activities "ensuring the accuracy and currency of" its voter lists. *Id.* § 20507(i)(1). Electronic production, however, is not required for these records—or any others—under the Act. Instead, the Act mandates "public inspection" and "photocopying at a reasonable cost." *Id.* Electronic production is neither. For that reason, the Act does not govern what fee, if any, Alabama is entitled to charge for electronic production of the records here. We therefore reverse the district court's order holding otherwise.

## I.

In 1993, to address flagging voter participation in federal elections, Congress adopted the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.* *See Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). The Act had "twin objectives": to increase turnout by easing voter registration barriers and to protect election integrity by maintaining accurate and current voter rolls. *Id.*; *see* 52 U.S.C. § 20501(b). In service of these goals, the Act required the states to adopt standardized registration procedures. *See* 52 U.S.C. §§ 20503–20506. The Act also introduced new federal requirements designed to ensure accurate voter rolls. *Bellitto*, 935 F.3d at 1198–99; *see* 52 U.S.C. § 20507.

The public disclosure provision, 52 U.S.C. § 20507(i)(1), is among those requirements. It covers a wide range of records—all those "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The Act requires states to "maintain" these records "for at least 2 years" and make them available for "public inspection and, where available, photocopying at a reasonable cost." *Id.* The Act exempts two categories of records from disclosure: those relating to an individual's choice to decline voter registration, and those revealing the identity of a voter registration agency through which a particular voter was registered. *Id.*

Less than a decade later, in response to election-administration inconsistences revealed during the 2000 election,

Congress passed the Help America Vote Act, requiring each state to maintain "a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A); *see* Ala. Code § 17-4-33 (implementing the Help America Vote Act); *Bellitto*, 935 F.3d at 1199.[1] Alabama maintains its voter registration information in a compliant electronic database. That database includes all registered voters, both active and inactive, as well as voters who were removed from the rolls and registration applications that were denied. The database also includes the reasons for these removals or denials. The Alabama Secretary of State, custodian of these records, is required by state law to sell lists of active and inactive voters to members of the public for "a uniform charge." Ala. Code § 17-4-38(a), (b). Requestors can specify the parameters of their searches through an online portal, and receive the records electronically for a longstanding fee of one cent per name, or in hardcopy for a fee of one dollar per page.

Greater Birmingham Ministries describes itself as a "multi-faith, multi-racial organization that provides emergency services for people in need and engages the poor and the non-poor in systemic change efforts to build a strong, supportive, engaged

---

[1] The Help America Vote Act also amended portions of the National Voter Registration Act not at issue here. *See* Pub. L. No. 107-252, § 903, 116 Stat. 1666, 1728 (2002). It did not, however, touch the National Voter Registration Act's public disclosure provision, and specifically caveated that it did not otherwise "supersede, restrict, or limit the application of" the National Voter Registration Act. 52 U.S.C. § 21145(a), (a)(4).

community and pursue a more just society for all people." Greater Birmingham Ministries, *Who We Are*, https://gbm.org/who-we-are [https://perma.cc/C8LP-584A]. As part of its mission, the ministry promotes voter registration efforts around Alabama, including by helping would-be voters navigate Alabama's felon disenfranchisement rules. One of those rules is that citizens convicted of a "felony involving moral turpitude" lose the right to vote. Ala. Const. art. VIII, § 177(b). State law specifies the disqualifying felonies and provides that a disenfranchised felon is eligible to have his right to vote restored after meeting certain conditions, including completion of his sentence and payment of any fines. Ala. Code §§ 15-22-36.1, 17-3-30.1. Greater Birmingham Ministries educates citizens with non-disqualifying felonies about the fact that they can still vote, identifies eligible voters with non-disqualifying felonies who were erroneously removed from the voter rolls, and guides disqualified felons through the process of restoring their voting rights.

Between May and September of 2021, Greater Birmingham Ministries submitted two record requests to the Secretary. *First*, it requested the list of every voter removed from the statewide voter rolls following the 2020 general election. *Next*, it requested lists from the past two years showing both registered voters who were removed from the rolls and rejected voter registration applications. This second request was later narrowed to only those records related to voters who were removed or denied registration because of a disqualifying felony conviction. Greater Birmingham Ministries was clear that it was making these requests under the

National Voter Registration Act, and asked to receive both sets of records in electronic format at no cost.

The Secretary's response was mixed. He offered to provide an electronic version of the first list of voter records—all voters purged from the voting rolls following the 2020 general election—at a cost of one cent per name. He also offered to allow in-person inspection of this list so that Greater Birmingham Ministries could decide whether to purchase a copy.[2] But the Secretary refused to provide any records at all related to felony disqualifications; he asserted that the request exceeded the scope of the Act.

Following these refusals, in December 2021 and January 2022, Greater Birmingham Ministries sent two letters notifying the Secretary of its intent to sue—a required precursor to any private suit under the National Voter Registration Act. *See* 52 U.S.C. § 20510(b). The notice letters explained that Greater Birmingham Ministries understood the Act to require that "electronic records be made available at no cost" and alleged that the Secretary's failure to provide the records in this way violated the law. The Secretary

---

[2] Because in-person inspection was so rarely requested, the Secretary did not have a formal policy governing in-person public inspection of voter records. While this litigation was pending, the Secretary formally adopted one. Under the new policy, the public can access the state's electronic voter database in the Secretary's office during normal business hours for up to four hours a day. They can take only limited notes and are barred from directly copying records from the database, but can purchase an electronic copy of the records for one cent per voter record, or a hardcopy printout for one dollar per page.

did not respond. After waiting the statutorily required twenty days, Greater Birmingham Ministries filed suit. *See id.* § 20510(b)(2).

After a two-day bench trial, the district court ruled that the National Voter Registration Act entitled Greater Birmingham Ministries to both sets of records: the list of all voters removed from the rolls after the 2020 election, and the records of all voters removed or denied registration because of felony convictions in the last two years. While the court agreed that the Act did not generally require covered records to be produced in an electronic format, it held that electronic disclosure was required "in the specific circumstances of this case, where the records are already kept in digital form, where providing them in any other form would unduly interfere with the NVRA's express purposes, and where the window of time before the registration deadline for the next election is so slim." As for cost, the court ruled that the Act entitled the Secretary to charge a "reasonable fee," connected "to the actual costs he incurs in producing responsive voter records."

Because Alabama's voter registration deadline for the 2022 general election was only weeks away at that point, the district court ordered the Secretary to provide Greater Birmingham Ministries the requested records "immediately." The court then allowed the parties two weeks after the general election to reach agreement on a "reasonable fee."

The Secretary complied with the injunction and delivered the requested records. The one-cent-per-name charge would have been $1,591.37. But "[w]ithout retreating from his position" that

he was entitled to charge one cent per voter record, the Secretary said that the electronic production had cost his office $429.17. Greater Birmingham Ministries, "without agreeing to the basis for the Secretary's calculated costs for the records at issue" or "their reasonableness under the statute," agreed to pay the production costs. After Greater Birmingham Ministries paid, the district court entered a final judgment. This appeal followed.[3]

## II.

We review questions of statutory interpretation de novo. *United States v. Bryant*, 996 F.3d 1243, 1251 (11th Cir. 2021).

## III.

We start with the scope of records that must be disclosed under the Act. The Act's public disclosure provision covers "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency

---

[3] This appeal is not moot, either in whole or in part. A party's "voluntary compliance with an injunctive order" moots an appeal "if the appellate court can grant the complying appellant *no* relief." *Burnett v. Kindt*, 780 F.2d 952, 955 (11th Cir. 1986) (emphasis added). We could provide relief to the Secretary by allowing him to recover the difference between the full fee he would have charged had he been permitted to sell the records for one cent per record and the costs Greater Birmingham Ministries actually paid below. *See United States v. Washington*, 596 U.S. 832, 837–38 (2022). A favorable ruling could also entitle the Secretary to have Greater Birmingham Ministries "destroy or return" copies of any disputed records it may have in its possession. *Church of Scientology of California v. United States*, 506 U.S. 9, 13 (1992). Either possibility is enough to prevent this case from becoming moot.

of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).[4] The Secretary contends that this statutory phrase covers neither records relating to the disqualification of voters because of a felony conviction, nor those concerning denials of new voter registration applications for the same reason. We disagree.

Alabama's efforts to keep disenfranchised felons off its voter rolls are plainly "programs and activities" that promote the "accuracy and currency" of its voter lists. Alabama law requires that county boards of registrars purge individuals convicted of a disqualifying felony from their voter rolls, and deny new voter registration applications from disqualified felons. Ala. Code §§ 17-3-54, 17-4-3(a). Permitting an ineligible voter to remain on or be added to the voter rolls renders Alabama's records less accurate and less current. 52 U.S.C. § 20507(i)(1). The lists of voters removed or denied registration because of felony disqualification are thus included in the set of "all records concerning the implementation of" these programs. *Id.*; *see Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335–36 (4th Cir. 2012).

The Secretary resists this common-sense reading of the provision. Under his interpretation, the Act's public disclosure provision covers only programs and activities related to so-called "list maintenance," which the Secretary defines as "updating and removing voters from the voter rolls that you have." (quotation

---

[4] The provision contains two exceptions to the disclosure requirement not relevant here. 52 U.S.C. § 20507(i)(1).

omitted).  Candidly, by that definition the requested records would also seem to fit.  The Secretary, however, offers a narrower interpretation of his own definition.  He argues that only those updates carried out to satisfy a different part of the Act, § 20507(a)(4), would qualify for disclosure.  That subsection requires states to "conduct a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible on account of death or change of residence, and only on those two accounts."  *Bellitto*, 935 F.3d at 1195.  So, by the Secretary's reading, subsection (i)(1) requires disclosure of only records related to removals for reason of death or change of residence, not denials of new voter registration applications and not removals for any other reason.

The statute's text says otherwise.  To start, the two subsections that the Secretary attempts to tie together—passed at the same time as part of the same parent section—use materially different language.  Subsection (i)(1) is about public disclosure, and refers broadly to "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  Subsection (a)(4), on the other hand, is an entirely separate list-maintenance requirement, directing states to adopt "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters."  Plus, subsection (i)(1) does not restrict a program's reasons for promoting voter roll accuracy, while subsection (a)(4) requires removals for only "the death of the registrant" and "a change in the residence of the registrant."  No other reasons.  *See Bellitto*, 935 F.3d

at 1203. That suggests that the greater, (i)(1), includes but is not limited to the lesser, (a)(4). Those differences alone show that the public disclosure provision's reach is far broader than the one mandatory list-maintenance program described in subsection (a)(4).

What's more, subsection (i)(1) never references subsection (a)(4) when defining the scope of its coverage. And Congress knows how to connect statutory provisions, as it proved elsewhere in this Act. Compare, for example, subsection (c)(1), which explicitly refers to subsection (a)(4) to define how a state may satisfy the requirements of that program. Half a dozen other subsections in § 20507 also define, narrow, or qualify their statutory commands by referencing other subsections. *See* 52 U.S.C. § 20507(b)(2), (c)(1)(B)(ii), (c)(2)(B)(i), (d)(2)(A), (f), (i)(2).[5] In short, if Congress had intended for (i)(1) to refer only to the mandatory program required by (a)(4), it knew how to say so.

---

[5] Subsection (i)(2) provides that the records subject to disclosure under (i)(1) "shall include" the names and addresses of voters who have been sent mailers related to the state's program of removing voters for change-of-address. The Secretary argues that this further supports his reading of (i)(1) as covering only records related to the mandatory programs of removal for death and change-of-address. But the word "include" ordinarily "introduces examples, not an exhaustive list." Antonin Scalia & Bryan A. Garner, *Reading Law* 132 (2012). Subsection (i)(2) instructs that a state's program of removing voters for change-of-address is one of the programs covered by (i)(1)—but it in no way suggests that it is the *only* one. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024).

The Secretary advances two alternative arguments—and neither fares any better.  The first is that records of the individual voters removed or denied registration need not be disclosed because the Act applies to records concerning the "implementation" of covered programs.  Under this reading, the disclosure requirement reaches only records relating to "the procedures a State has put into effect to ensure the accuracy and currency of the official lists."  (quotation omitted).  Covered records under this definition would include, for example, documents describing how often the state's purge processes occur, who administers them, or what criteria is used to remove voters— but not the affected voter records themselves.

This cramped interpretation of § 20507(i)(1) is defeated by its neighbor, subsection (i)(2).  The Secretary argues that (i)(1) does not reach any records of individual voters, but (i)(2) specifies that (i)(1) includes at least one set of such records: the names and addresses of individual voters who have been sent mailers as part of a state's program of removing registered voters after a change of address.

The Secretary's own definitions also belie his interpretation. His cited dictionaries define "implement" as to "complete, perform, carry into effect"; "carry out, execute"; or "accomplish." *Implement*, Oxford English Dictionary (2d ed. 1989); *Implement*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993).  The lists of voters removed from the rolls or denied registration in the first place concern the "performance," "carrying out," and "execution"

of a program aimed at ensuring voter roll accuracy just as much as a procedure manual on program administration, even though the Secretary's proposed interpretation would reach only the latter. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 46–49 (1st Cir. 2024).

The Secretary backs up his argument with a 1994 guide from the Federal Election Commission. But by the Secretary's own admission, that document provides no reasoning for its assertion that the public disclosure provision does not reach individual voter records. It also expressly caveats its suggestions with a warning that the FEC has no legal authority to interpret the Act and that the guide's recommendations do not carry the force of law.[6] We decline to give the guide any weight—an unreasoned interpretation offered thirty years ago by an administrative agency with no interpretive authority cannot override the plain text of the Act.

The Secretary's second alternative argument is that, if all else fails, producing a customized list of records would require him to create *new* records. And that, he says, would go beyond the statute's requirement for states to "maintain" and "make available" *existing* records. No. As the Secretary admits elsewhere, the requested records exist and are coded by felony disqualification status. Just as "physically searching through and locating data

---

[6] Even less so now, we add; in 2002, the Help America Vote Act transferred the Federal Election Commission's powers under the National Voter Registration Act to a newly created agency, the Election Assistance Commission. Pub. L. No. 107-252, § 802, 116 Stat. 1666, 1726.

within documents in a filing cabinet" does not fill the cabinet with new documents, "using a query to search for and extract a particular arrangement or subset of data already maintained in an agency's database does not amount to the creation of a new record." *Ctr. for Investigative Reporting v. U.S. DOJ*, 14 F.4th 916, 938 (9th Cir. 2021). Ruling otherwise would defeat the logic of a vast number of public disclosure laws premised on the ability of a requestor to receive a subset of the records a governmental entity holds. *See, e.g.*, 5 U.S.C. § 552(a)(3)(A), (C).

In sum, the records that Greater Birmingham Ministries seeks—lists of individuals who were either removed from the voter rolls because of a disqualifying felony or denied from registering to vote because of a disqualifying felony—are records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). They are covered by the National Voter Registration Act's public disclosure provision, and the Secretary is obligated to disclose them as the Act directs.

## IV.

Our inquiry, however, does not end there. The fact that these records are covered by the public disclosure provision does not mean that requestors are entitled to receive them in any manner they choose. Instead, the Act requires states to make covered records available in two ways: (1) for "public inspection," and (2) "where available, photocopying at a reasonable cost." 52 U.S.C. § 20507(i)(1).

Greater Birmingham Ministries seeks neither of these, though it won't say so outright. It asks for electronic production of the records, but attempts to characterize that as "public inspection." The United States, for its part, asserts that electronic production falls within "photocopying." But electronic production is neither public inspection nor photocopying; it is an entirely different method of disclosure. And as much sense as it would make to do so, Congress has not chosen to require electronic production—at least not in this statute.

## A.

We begin with the ordinary meaning of the words "public inspection," keeping in mind the "fundamental canon of statutory construction" that words take "their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (alterations adopted) (quotation omitted). To "inspect" is to "look carefully into" or to "view closely and critically." *Inspect*, Oxford English Dictionary (2d ed. 1989). To make something available for "public" inspection, then, is to make it available in public, or to the public, for close scrutiny. Though this definition alone does not establish everything that public inspection *is*, it does clarify what it *isn't*—copying an item or permanently handing it over.

Congress, moreover, was not drafting on a blank slate when it chose the words "public inspection." Decades earlier, it had passed the Freedom of Information Act "to open agency action to the light of public scrutiny." *U.S. DOJ v. Tax Analysts*, 492 U.S. 136,

142 (1989) (quotation omitted).  As originally enacted, FOIA required federal agencies to "make available for public inspection and copying" agency opinions, policy statements and interpretations, and administrative staff manuals and instructions. Freedom of Information Act, Pub. L. No. 89-487, 80 Stat. 250 (1966); *compare id.* ("make available for public inspection and copying"), *with* National Voter Registration Act of 1993, Pub. L. No. 103-31, § 8(i)(1), 107 Stat. 77, 86 ("make available for public inspection and, where available, photocopying").  This disclosure requirement was colloquially known as the "reading-room provision," named after the physical rooms housed in agency headquarters where records could be viewed.  *See* Michael Herz, *Law Lags Behind: FOIA and Affirmative Disclosure of Information*, 7 Cardozo Pub. L., Pol'y & Ethics J. 577, 586–87 (2009).

Any documents made available for public inspection in a reading room were exempted from an agency's FOIA obligation to produce records upon request.  *See* 5 U.S.C. § 552(a)(3) (1988); *Tax Analysts v. U.S. DOJ*, 845 F.2d 1060, 1066–67 (D.C. Cir. 1988), *aff'd*, 492 U.S. 136 (1989); *Mandel Grunfeld & Herrick v. U.S. Customs Serv.*, 709 F.2d 41, 42–43 (11th Cir. 1983).  In other words, so long as an agency maintained its records for public viewing at its headquarters, FOIA did not require that agency to also "mail copies" of its records out to requestors.  *Tax Analysts*, 845 F.2d at 1067.  So, in 1993 when the National Voter Registration Act was passed, the meaning of the phrase "public inspection" in FOIA's nearly identically worded provision was widely understood to require "only availability, not delivery"—and certainly not *electronic*

delivery. *Mandel Grunfeld & Herrick*, 709 F.2d at 43 (quotation omitted); *see also Nolen v. Rumsfeld*, 535 F.2d 890, 891–92 (5th Cir. 1976) (FOIA requires "availability, not delivery").

For FOIA, though, Congress decided to pass an update. By 1996, three years *after* the National Voter Registration Act was enacted, Congress had recognized that the physical reading-room requirement was outmoded in an era of increasing digitization. The Electronic Freedom of Information Act Amendments of 1996 updated FOIA by requiring agencies to make records available "by computer telecommunications" or "other electronic means." Pub. L. No. 104-231, § 4, 110 Stat. 3048, 3049. These amendments also required agencies to "provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." *Id.* § 5, 110 Stat. at 3050.[7]

Not so for the National Voter Registration Act. Congress has never updated the language of the public disclosure provision—even when it had the perfect opportunity. Both Greater Birmingham Ministries and the partial dissent argue that the Act's public disclosure provision must be read in concert with the later-enacted Help America Vote Act of 2002. Partial Dissent at 14–18. Of course that is true—but it does not change the result here. The Help America Vote Act amended certain portions of the National

---

[7] The 1996 amendments were followed by the FOIA Improvement Act of 2016, which amended § 552(a)(2)'s "public inspection and copying" provision to read "public inspection in an electronic format." Pub. L. No. 114-185, § 2, 130 Stat. 538, 538.

Voter Registration Act by explicit reference; the public disclosure provision is not among them. *E.g.*, Pub. L. No. 107-252, § 903, 116 Stat. 1666, 1728 (2002). What's more, the Act caveats that apart from those specified provisions, it does not "supersede, restrict, or limit the application of" the National Voter Registration Act. 52 U.S.C. § 21145(a), (a)(4). Whatever the overlap between the two statutes' broadest purposes may be, we cannot make the Help America Vote Act override provisions of the National Voter Registration Act that it explicitly disclaims amending.[8]

In short, "public inspection" as used in the National Voter Registration Act does not include electronic disclosure. Congress has recognized this shortcoming in FOIA but has not acted for the National Voter Registration Act. No amount of purpose-driven inference can expand the meaning of a statute, and we cannot step in to help.

## B.

The same goes for the Act's "photocopying" provision—electronic production of a database does not fit there, either. This is one of those times when common sense is likely enough. After

---

[8] The partial dissent also points to an Alabama statute requiring the Secretary to disclose "requested voter lists in a timely manner" and forbids "[h]indrances" created "to delay transmission" of the requested lists. Ala. Code § 17-4-38(a); Partial Dissent at 15–18. But Greater Birmingham Ministries did not bring suit under Alabama law—it brought suit under the National Voter Registration Act. Compliance with the former is irrelevant to understanding what the latter requires.

all, if you can't put something on a photocopy machine, you can't photocopy it. But we will go further. The United States's own cited dictionaries define "photocopy" as "a photographic reproduction of (printed or graphic material)" and "a negative or positive photographic reproduction of graphic matter." *Photocopy*, The American Heritage Dictionary of the English Language (3d ed. 1992); *Photocopy*, Webster's Third New International Dictionary of the English Language (1993 ed.). An electronic database is not "printed or graphic material." And electronic files are not "photographic reproductions" of the underlying records. As any former intern can tell you, if your boss asks for a photocopy of a document, you walk over to the photocopier, feed the original into the machine, and return with a physical, printed copy. Most employers would be quite surprised to receive an email attachment or flash drive instead.

Nor can we strip "photo" from "photocopy," as the United States would have us do. It cites several cases—from other courts, interpreting other statutes—that say a "copy" of a document can be electronic. We have no argument with that. But just because an electronic copy fits within the broader term "copy" does not mean it also satisfies the narrower category "photocopy." Ancient scribes copied important texts by hand. Are they photocopies too? A comparable argument would be that because squares and triangles are both shapes, squares are also triangles. Obviously not. Even if "copy" can include electronic production, "photocopy" cannot.

## C.

The district court agreed—it concluded that "the text of the public-inspection provision does not specifically provide for digital access." The inquiry should have ended there. Instead, the court proceeded beyond the statute's terms, deciding that electronic production was required "in the specific circumstances of this case, where the records are already kept in digital form, where providing them in any other form would unduly interfere with the NVRA's express purposes, and where the window of time before the registration deadline for the next election is so slim." The court reasoned that to "hold otherwise would be to sanction precisely the kind of administrative chicanery and inefficiencies that the NVRA was designed to prevent." (alteration adopted) (quotation omitted).

We disagree. Holding that a party did not violate the law is different than approving of its behavior. And we cannot change the requirements of a statute just because doing so seems consistent with its goals. After all, "purpose cannot be used to contradict text or to supplement it." *Bellitto*, 935 F.3d at 1201 (alteration adopted) (quotation omitted). Indeed, "the NVRA is particularly ill-suited to focus on purpose rather than text because the statute's purposes are multiple and in some tension with each other." *Id.* Simply put, the Act's public disclosure provision does not speak of digital storage, time pressures, or "administrative chicanery." It speaks of "public inspection" and "where available, photocopying." 52 U.S.C. § 20507(i)(1). The exigencies of one case, however compelling, cannot expand unambiguous text beyond its plain command. "The

statute says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 426 (2018).

## V.

The final question is whether the Act regulates the fees the Secretary may charge for electronic production. Because the Act does not require electronic production at all, the answer is simple: it poses no limit. The Act's disclosure provision cannot conflict with the Secretary's one-cent-per-record fee because that provision "has nothing whatsoever to do with" electronic production in the first place. *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008). The district court therefore erred by ordering the Secretary to charge a "reasonable fee" for these records "based on the actual costs" incurred in their production.

\*    \*    \*

At bottom, all three parties—Alabama, Greater Birmingham Ministries, and the United States as amicus curiae—resort to fairweather textualism, applying the ordinary meaning of the Act's text only when it suits them. Alabama tries to evade a straightforward requirement to produce voter records relating to implementation of its felon disenfranchisement rules. We will not artificially narrow that command. As for attempts by Greater Birmingham Ministries and the United States to read electronic production into the Act, we are not insensitive to the charge that the public disclosure provision is an awkward fit for today's technology. But that does not give this Court a license to legislate.

Perhaps, as the partial dissent proposes, "Congress should amend the public disclosure provision because satisfying an applicant's request through digital production is more efficient, cost-effective, and timely than any other method of production the State has proposed." Partial Dissent at 25. Maybe Congress will agree, too—it has already made that change (twice) with the Freedom of Information Act. But unless and until it does so for the National Voter Registration Act, we will decline "to apply laws that have not yet been written." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 456 (1984). And because the Act does not require electronic disclosure, it also does not decide what fee, if any, the Secretary would be entitled to charge for the electronic records sought here.

In sum, the voter records that Greater Birmingham Ministries requests are covered by the National Voter Registration Act's public disclosure provision. But because the Secretary was not required to turn those records over in an electronic format, the district court's injunction ordering the Secretary to produce the records electronically was improper. The same is true for its direction that the parties reach agreement on a reasonable fee.

We **REVERSE** the district court's order and **REMAND** for proceedings consistent with this opinion.

22-13708  ABUDU, J., concurring in part and dissenting in part      1

ABUDU, Circuit Judge, concurring in part and dissenting in part:

On appeal, the Majority Opinion affirms the district court's ruling that lists of individuals who, because of a disqualifying felony, were either removed from Alabama's voter rolls or denied from registering to vote are records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Accordingly, the Majority Opinion finds those lists are covered by the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.* ("NVRA")'s public disclosure provision, and Alabama's Secretary of State is obligated to disclose them as the Act directs. I agree with that decision.

However, I depart and dissent from the remainder of the Majority Opinion's holdings. The NVRA's language and purpose, read in harmony, require a State to respond to applicable records requests, out of the growing options available for the production of documents, through a method that makes them meaningfully "available for public inspection." 52 U.S.C. § 20507(i)(1). The State's refusal to do so is the underlying problem that this appeal truly poses. Specifically, the NVRA requires Alabama's Secretary of State to provide public documents in a manner that is expedient and accessible to the public. In this case, that manner is through production of the records in the digital format that Alabama is required by statute to maintain and that it already has produced to Greater Birmingham Ministries, pursuant to the district court's order.

## I.    BACKGROUND

Plaintiff-Appellant Greater Birmingham Ministries ("GBM"), a nonprofit organization, requested records from Alabama's Secretary of State (the "Secretary") so that it could increase voter registration and turnout.  Specifically, GBM sought to guide previously disenfranchised individuals through the process to have their rights restored and to register to vote.  When the Secretary denied GBM's requests, GBM filed suit, asserting a cause of action for the Secretary's violation of the NVRA.  Following a bench trial and a district court order in GBM's favor, the Secretary produced the requested documents at a negotiated fee in electronic format.  The Secretary appeals the district court's order, including the district court's finding that the NVRA required the Secretary to produce the voter registration records in an electronic format.

### A.  Existing Law and Context on Voter Registration Records

Congress passed the NVRA, in part, to take advantage of the multiple opportunities that eligible voters had, through interactions with state agencies, to register to vote.  Accompanying its passage of the Act, Congress made specific findings, which included the conclusion that "it is the duty of the Federal, State, and local governments" to promote the "fundamental right" of United States citizens to vote.  52 U.S.C. § 20501(a)(1), (2).  Congress also found that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect" on

22-13708  ABUDU, J., concurring in part and dissenting in part      3

voters' exercise of that right.  *Id.* § 20501(a)(3).  Considering those findings, Congress declared the purposes of the Act.  *Id.* § 20501(b).  Those purposes include: "establish[ing] procedures that will increase the number of eligible citizens who register to vote," enabling State governments to implement the Act "in a manner that enhances the participation of eligible citizens as voters," and "protect[ing] the integrity of the electoral process."  52 U.S.C. § 20501(b)(1), (2), (3).  While the Act states multiple goals, its first and most often-cited purpose is to increase voter registration and election participation among voters.  *See id.*  One of the vehicles Congress established to further that overarching goal is the NVRA's public disclosure provision.  *See id.* § 20507(i).  The public disclosure provision requires states to produce records related to their maintenance of voter rolls, and those records typically identify eligible and potentially eligible voters who have and who have not registered to vote.  *See id.*

Several years after passing the NVRA, Congress enacted the Help America Vote Act, 52 U.S.C. § 20901, *et seq.*, ("HAVA"), which compelled states to adopt election and voter registration systems that comport with modern-day technology.  *See* Pub. L. No. 107-252, 116 Stat. 1666.  In addition to requiring states to maintain "a single, uniform, official, centralized, interactive computerized statewide voter registration list," HAVA requires voter registration records to be maintained accurately.  *See* 52 U.S.C. § 21083(a)(1)(A), (a)(2)(A), (a)(4).  HAVA's accuracy standard includes safeguards against improper removal of voters and requires removal of

ineligible voters to be "consistent with the National Voter Registration Act." *Id.*

From the passage of the U.S. Constitution all the way to modern-day voting rights acts like the NVRA and HAVA, Congress has delegated significant responsibility and some discretion to the states in the administration of election laws. *See* U.S. Const., Art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."); *see also* 52 U.S.C. § 20503(a) (establishing voter registration procedures and standards, but allowing state discretion in implementation); *id.* § 21083 (same, but for requirements regarding voter registration recordkeeping). Congress's trust in the States, especially Alabama, unfortunately has been tempered by the countless examples of efforts election officials have taken to narrow the avenues designed to protect the fundamental right to vote.[1]

---

[1] As recently as last year, Alabama has persistently refused to comply with federal laws regarding voting rights. For example, in *Singleton v. Allen*, a three-judge panel in Alabama was faced with such a refusal following the grant of a preliminary injunction on the basis that the State's proposed redistricting map unlawfully diluted the votes of Black Alabamians, in violation of Section 2 of the Voting Rights Act. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 1026 (N.D. Ala. Jan. 24, 2022). After the Supreme Court resoundingly affirmed the district court panel, *Allen v. Milligan*, 599 U.S. 1 (2023), the State continued to insist that it was not required to redraw its map as ordered by the panel. *Singleton v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 6567895, at *1–2 (N.D. Ala. Oct. 5, 2023). As the district court explained before ordering the map be redrawn by a special master, "[w]e are not aware of any other case in which a state

22-13708  ABUDU, J., concurring in part and dissenting in part      5

Alabama does not stand alone; there have been many lawsuits exposing how, even when state agencies do have voter registration information available, that information is not readily accessible to all people, especially those with disabilities, those of color, and those living in rural communities. *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012) (suit filed for Virginia's failure to provide registration records that "a nonprofit organization seeking to increase voter registration among young, low-income, and minority voters" requested pursuant to the NVRA's public disclosure provision); *Voter Reference Found., LLC v. Torrez*, No. CIV 22-0222 JB/KK, 2024 WL 1347204, at *34 (D.N.M. Mar. 29, 2024) (contesting New Mexico's criminalization of sharing voter data where plaintiff nonprofit asserted "that it is too difficult and expensive for individuals . . . to get the same access to voter data as political campaigns without [plaintiff] obtaining and disseminating the information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1329 (N.D. Ga. 2016) (nonprofit plaintiff filing suit after Georgia's failure to provide all records requested pursuant to the public disclosure provision, where plaintiff had concerns about improper denial of registration arising from citizenship inquiries).  Such suits show that the public

---

legislature — faced with a federal court order declaring that its electoral plan unlawfully dilutes minority votes and requiring a plan that provides an additional opportunity district — responded with a plan that the state concedes does not provide that district." *Id*. at 2.  Such behavior on Alabama's part accurately reflects only some of the backdrop against which the instant dispute over voter registration records takes place.

disclosure sections of both the NVRA and HAVA have been critical to shining a bright light on state government activities when it comes to protecting the fundamental right to vote.[2]  Here, the Secretary's ongoing effort through this lawsuit to curtail a nonprofit's access to voter information for the primary purpose of encouraging people to vote is just the most recent example of why the NVRA, HAVA, and other voting laws remain critical.

### B.  GBM's Voter Registration Records Requests

GBM is a nonprofit, community-based organization that provides "financial help, food, clothing, and support to families and individuals in crisis," including the estimated 27% of children in Jefferson County living through generational poverty.  Greater Birmingham Ministries, *Serving People*, https://gbm.org/serving-people/ (last accessed May 30, 2024).  Voter participation across the country, and especially in southern and more rural areas, has increased over the years as a direct result of organizations making a concerted effort to increase such participation.  As one such organization, GBM educates policy makers and other stakeholders about the economic challenges thousands of Alabamians experience, and it incorporates voter registration drives and "Get Out the Vote" initiatives to increase voter turnout and political power in marginalized communities.  *See* Greater Birmingham

---

[2] "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."  Louis D. Brandeis, *What Publicity Can Do*, Harper's Weekly, Vol. 58 (Dec. 20, 1913).

22-13708  ABUDU, J., concurring in part and dissenting in part      7

Ministries, *Voter Registration*, https://gbm.org/voter-restoration/ (last accessed May 30, 2024).

To accomplish its goal of increasing voter registration, GBM sought information regarding (1) individuals who were removed from the voter rolls or had their voter registration applications denied due to a disqualifying felony conviction, and (2) all individuals removed from the voter rolls for any reason following the 2020 general election.  Given Alabama's requirement under HAVA and Ala. Code § 17-4-38 to maintain all its voter registration records in an electronic format, GBM also asked that the Secretary electronically produce the records containing the information sought.

The Secretary refused to produce the records GBM sought. Instead, he offered to sell some of the records in electronic format at a price of $0.01 per name, or to have GBM inspect those records in-person, subject to numerous restrictions.  However, the Secretary insisted that records with information regarding disenfranchised individuals were not available for sale or review at all.  After failed negotiation attempts with the State, and upon providing the necessary pre-suit notice under the NVRA, GBM filed suit against the Secretary, asserting that his refusal to provide the requested records without charge violated the NVRA.

### C. *Procedural History and Pertinent Evidence at Bench Trial*

After denying the Secretary's motions to dismiss GBM's original and amended complaints, the district court held a two-day

bench trial. Following the trial, the district court made several findings related to the Secretary's practices of managing voter registration records. First, the court found that the Secretary "maintains all of the information that GBM [ ] requested in a digital database." The court further found that the Secretary regularly sells reports regarding the State's voter rolls to the public, and he provides those reports to buyers via a data-sharing tool such as DropBox[3] or, if the data set is small enough, via email. In addition, the court noted that the Secretary "[did] not maintain on paper the information that GBM [ ] requested."

Unrebutted evidence presented at trial demonstrated several other facts regarding the Secretary's relevant practices and operations. Conspicuously, the Secretary of State's Office modified its open records policy less than a month before the bench trial. Prior to this modification, digital format was essentially the *only* method through which the Secretary responded to open records requests. In fact, the Secretary's deputy chief of staff testified that "[w]hen somebody requests a voters list . . . we're assuming that they're wanting to buy the voters list." He explained that, accordingly, the office would not initially offer in-person inspection to individuals inquiring about the lists. That same deputy chief

---

[3] Dropbox is a digital file storage provider which allows users to store files, documents, and photos online with the ability to access them from any device. Dropbox, *Features*, https://www.dropbox.com/features (last accessed May 30, 2024). Pertinent to the dispute here, Dropbox allows users to "[e]asily share files and folders from . . . cloud storage, simply by copying a link," and "[t]ransfer large files . . . by sending a link for recipients to download." *Id.*

22-13708  ABUDU, J., concurring in part and dissenting in part    9

testified that since joining the Secretary's office in 2012, he recalled the office offering in-person inspection of records less than ten times, and he was aware of no instance in which in-person inspection actually occurred.  Perhaps because the State realized that it could not seriously launch a defense while it exclusively relied on a computerized voter registration database, it established a new policy to permit in-person inspection of records.

Pursuant to the Secretary's new public inspection policy, applicants may, after submitting a written request, come to the Secretary's office in Montgomery for no more than four hours to sift through thousands of voter registration records.  Individuals who engage in in-person inspections may not bring cell phones, cameras, or audio/visual equipment.  The Secretary's representative confirmed at trial that these restrictions are generally "to prevent folks from getting around having to pay for these lists."  Similarly, the policy permits inspectors to take only "limited notes on paper," which again is intended "to prevent people from copying verbatim" the information in the records.  Prior to any in-person inspection, the Secretary's staff first pulls from the electronic database any records responsive to the prospective inspector's request.  Although the staff requires assistance from a third-party contractor to pull some records, the Secretary's Office relies upon that contractor whether the request involves the sale of records or in-person inspection.  Those records are then uploaded onto a public computer for inspection at the Secretary's office.  The format of the records on the public computer is the same as that provided for sale, i.e. they are in digital

format.  However, the Secretary does not charge a fee for this in-person inspection of the records.  Finally, the Secretary requires that any public inspection of voter registration records be supervised by a member of his staff.  The Secretary's deputy chief admitted that this new public-inspection policy was more expensive for the State than the digital delivery method he regularly employed.

There also was testimony at trial regarding the practical implications of the Secretary's policies and refusal to provide records pursuant to the NVRA.  In particular, the unrebutted testimony of GBM's lead volunteer explained the difficulties inherent in "public inspection," as defined by the Secretary's new policy.  She stated that "the only meaningful way to receive this data would be electronically . . . so that it can be organized" and utilized effectively for purposes such as "assist[ing] people in correcting [registration] errors and helping them restore their voting rights or register to vote."  Any other format, she said, would be "[e]xtremely less helpful."  She explained that GBM "can't work with information that's just on a computer screen that we look at.  . . . [W]e're not looking at one document or . . . one paragraph of information.  These are voter lists."  The lead volunteer said that in comparison to electronic records, sitting in an office to look at a list of 112,000 names on a computer, with only an allowance for limited note taking, would be "completely absurd."

22-13708  ABUDU, J., concurring in part and dissenting in part      11

### D.  The District Court's Instructions to Produce Electronic Records

The district court held that the Secretary was required to provide GBM the records it sought in digital form.  In reaching that conclusion, the court explained that "time" was "now of the essence, through no fault of GBM," noting that despite the rapid pace of litigation there was less than three weeks between the date of the court's order and the registration deadline for the November 2022 election.  GBM initially filed its records request in the spring of 2021, with the goal of increasing voter registration for the 2022 general elections.  Despite GBM's early and consistent efforts, the Secretary was still dragging his feet in 2022.  At that point, the Secretary still refused to provide, without charge, the most basic information the NVRA covers – data regarding the "voters that were removed from the list . . . pursuant to the NVRA."  With Alabama's voter registration deadline quickly approaching, there remained possibly hundreds of eligible voters who were unaware of their rights.[4]  As the district court emphasized, "outreach to

---

[4] Despite efforts to the contrary, there remains an astounding number of disenfranchised adults in Alabama, many of whom may be eligible to have their rights restored.  *See How To: Restore Your Voting Rights*, ACLU of Alabama (last revised Aug. 31, 2020) (https://www.aclualabama.org/en/how-to/restore-your-voting-rights) (explaining that "[c]onfusion about and misapplication of [felony disenfranchisement] laws . . . disenfranchise countless [] Alabamians" but that "[a] new law enacted in 2017 . . . ma[de] it easier for many to restore their voting rights."); *see also* Christopher Uggen et al., *Locked Out 2022: Estimates of People Denied Voting Rights*, The Sentencing Project (Oct. 25, 2022), (https://sentencingproject.org/reports/locked-out-

12    ABUDU, J., concurring in part and dissenting in part  22-13708

voters must be conducted *before* the registration deadline in order
to be effective."  In addition, the court considered testimony from
GBM's lead volunteer that "these timelines are now extremely
tight" and that with respect to the November 2022 election, GBM
already "cannot be as effective as [it] might have been . . . had [it]
had th[o]se records some months ago."

In reaching its ruling, the district court also cited the NVRA's
goals of "establish[ing] procedures that will increase the number of
eligible citizens who register to vote," "protect[ing] the integrity of
the electoral process," and "ensur[ing] that accurate and current
voter registration rolls are maintained."  The court held that the
NVRA's public disclosure provision "requires digital access in the
specific circumstances of this case, where the records are already
kept in digital form, where providing them in any other form
would unduly interfere with the NVRA's express purposes, and
where the window of time before the registration deadline for the
next election is so slim."[5]  The district court declined to hold that
the provision *always* requires digital access.  However, given the

─────────────

2022-estimates-of-people-denied-voting-rights/) (estimating that in Alabama,
"more than 8 percent of the adult population, one of every 13 adults, is
disenfranchised").

[5] When federal courts are confronted with election law disputes and limited
time before an election, there are "considerations specific to election cases"
that they must weigh.  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  Nonetheless,
those considerations cannot control appellate review, and even in such
constrained situations, this Court must give deference to the district court's
role in making factual findings.  *Id.* at 5.

22-13708  ABUDU, J., concurring in part and dissenting in part    13

time constraints on GBM and the district court's other factual findings, the court ruled that a method other than electronic delivery in this case would contravene the purpose of the NVRA.

## II.    STANDARD OF REVIEW

We review *de novo* the district court's statutory interpretation of the NVRA. *Serrano v. U.S. Atty. Gen.*, 655 F.3d 1260, 1264 (11th Cir. 2011). A district court's factual findings following a bench trial are reviewed for clear error. *Hodges v. United States*, 78 F.4th 1365, 1374 (11th Cir. 2023); *see also Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1253 (11th Cir. 2016) ("[W]e review factual findings only for clear error, drawing all inferences in favor of the district court's decision.") (internal citations omitted); *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) ("A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.") (internal quotations and citations omitted). The district court's application of law to the facts is reviewed *de novo*. *Holston Invs., Inc. v. LanLogistics, Corp.*, 677 F.3d 1068, 1070 (11th Cir. 2012).

## III.    DISCUSSION

The Secretary presented the issue on appeal as follows: "Does the NVRA require States to make available electronic copies of records?" The answer is yes, when electronic copies of records are the most cost-effective, efficient, and timely manner of delivery. This conclusion is bolstered by the express policy of the NVRA and

14    ABUDU, J., concurring in part and dissenting in part  22-13708

the textually permissible reading that inspection, as used in the Act, necessitates an opportunity for meaningful examination. Moreover, given electronic delivery was the only method through which the Secretary generally offered to produce records when GBM submitted its request, the organization chose the only option the Secretary had made available to it.

### A.  The NVRA Must Be Read in Harmony with Related Statutes

The NVRA, as its name suggests, is focused on a wholistic approach to voter registration. This approach includes disseminating voter education materials, increasing voter registration opportunities, and guiding civic organizations in their outreach to register eligible voters. *See, e.g.*, 52 U.S.C. § 20504 (requiring state driver's license applications to include the option for simultaneous registration to vote); *id.* § 20506 (requiring the designation of voter registration agencies and establishing requirements for those agencies). To increase public confidence in the voter registration process, the NVRA requires the Secretary to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* § 20507 (i). The statute additionally obliges the Secretary to ensure that "the maintenance of an accurate and current voter registration roll" for federal elections is "uniform" and "nondiscriminatory." *Id.* § 20507(b).

22-13708  ABUDU, J., concurring in part and dissenting in part     15

The standards articulated in HAVA, accompanied by multiple internal references to the NVRA, indicate that HAVA should be read in concert with the NVRA. *See* Antonin Scalia & Bryan A. Garner, *Reading Law* § 39 (2012) ("[L]aws dealing with the same subject . . . should if possible be interpreted harmoniously."); 2 Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 539 (1947) ("Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes."). Reading the NVRA and HAVA together, it is clear that HAVA was similarly designed, in part, to increase voter access. *Compare* 52 U.S.C. § 20501(b) (expressing the NVRA's purpose of increasing eligible voter participation), *with id.* § 21083(b)(2)(B) (establishing "fail-safe voting," and allowing provisional ballots to be cast when certain requirements are not met at the time of the election).

Federal courts also consider state laws on voter registration records when addressing claims brought under the NVRA. *See, e.g. Bellitto v. Snipes*, 935 F.3d 1192, 1195 (describing relevant Florida law regarding voter registration list maintenance); *Project Vote*, 682 F.3d at 335 (analyzing Virginia's law for file maintenance in the context of an NVRA lawsuit). Relevant to this case, Alabama maintains its voter registration rolls in accordance with HAVA and the State's own NVRA-implementing legislation, Ala. Code § 17-4-38. HAVA provides that:

> [E]ach State . . . shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official,

> centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State.

52 U.S.C. § 21083(a)(1)(A). Accordingly, Alabama maintains the lists that GBM requested in an "official, centralized, interactive computerized statewide" database. The Secretary's deputy chief of staff confirmed at trial that this database is the same one from which the Secretary provides voter registration records.

In addition to HAVA, Alabama law requires the Secretary to produce public voter registration records "in a timely manner," and forbids any "[h]indrances" that the Secretary might "create[] or devise[]" to delay its production. Ala. Code § 17-4-38(a). This statutory language tracks with the established purpose of the NVRA's public disclosure provision. As the Fourth Circuit explained, "[the public disclosure provision] embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334–35 (4th Cir. 2012). Alabama's legislature also identified circumstances in which electronic production is required for purposes of timely delivery. *See* Ala. Code § 17-4-38(f), (g). Therefore, the State already has set electronic production as the benchmark for purposes of ensuring

that documents are produced in a timely manner.  Given our current technology, there is nothing more readily available than attaching an electronic file to an email and pressing "send."

> B.  *The NVRA's Requirements When Read in Harmony*
> *with HAVA and Alabama Law*

As explained above, the NVRA's public inspection provision, including Section 20507(i)(1)'s requirement that the Secretary "make available for public inspection" the relevant records, must be considered in harmony with HAVA and Alabama law regarding the maintenance and distribution of voter registration lists.  The records covered by this provision are "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . ."  52 U.S.C. § 20507(i)(1).  HAVA requires such a list to be computerized, *see id.* § 21083, and testimony at trial confirmed that, in this case, the computerized list and the one the Secretary provides in response to NVRA requests are one and the same.  Section 17-4-38 of the Alabama Code, which also governs the Secretary's maintenance and reproduction of the same computerized list, further requires a "timely" response to records requests without "[h]indrances" or "delay."  Ala. Code § 17-4-38(a), (c).

Despite the requirements above, the Secretary's public inspection policy and continued refusal to provide digital records are the epitome of hindrance and delay.  The Secretary has spent Alabama's limited financial resources and staff time on challenging

a law specifically designed to block him from engaging in the recalcitrant behavior fully on display in this case.  Without any shame, the Secretary is openly undermining transparency in the voter registration process and financially hamstringing local voter outreach groups.  The public inspection policy the Secretary's deputy chief described places exhausting limits on access to records.  Even worse, the deputy chief admitted that those restrictions are *intended* to discourage use of the public inspection procedures so that individuals seeking records will purchase them instead.  The Secretary's appeal, therefore, is more about whether he can impose an onerous, unreasonable, and unnecessary barrier to lower-resourced community groups than whether he has the legal obligation and ability to maintain and produce the public documents in an electronic format.

In sum, the Secretary's records policy does not comply with the efficiency mandates of HAVA and Alabama law, which this Court must consider in resolving the instant action brought pursuant to the NVRA's public disclosure provision.  Because the Secretary declined to demonstrate or identify any other method by which he can timely respond to NVRA records requests without hindrance or delay, the public disclosure provision requires him to provide the records in digital format.  *See* 52 U.S.C. § 20507(i)(1); Ala. Code § 17-4-38(a), (c).

22-13708  A BUDU, J., concurring in part and dissenting in part     19

### C.  The Role of the NVRA's Purpose in Interpreting the Act

It is a basic canon of statutory construction that jurists should favor an interpretation that furthers, rather than obstructs, the statute's purpose.  The canon is the rational implication of three realities: "(1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness."  Scalia & Garner, *supra*, § 4.  Thus, it is no surprise that the Supreme Court has emphasized the importance of statutory purpose for over two-hundred years.  *See The Emily*, 22 U.S. 381, 389 (1824) ("To apply the construction contended for on the part of the claimant . . . would be rendering the law in a great measure nugatory, and enable offenders to elude its provisions in the most easy manner.").  A statute's purpose aids in selecting among textually permissible meanings, and purpose cannot be used to amend the text; however, neither can purpose be ignored when the practical effect of one construction renders a provision of the text ineffective.  *See Cnty. of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 178–79 (2020) (rejecting plaintiff's proffered interpretation of a statute where the Court did "not see how Congress could have intended to create such a large and obvious loophole" in the regulation at issue).

Here, the Secretary's refusal to provide records in digital format undercuts the policy goals that Congress seeks to advance through the NVRA, of which HAVA and Ala. Code § 17-4-38 are related extensions.  As the Majority Opinion correctly states, "[t]o 'inspect' is to 'look carefully into' or to 'view closely and critically.'"

20    ABUDU, J., concurring in part and dissenting in part  22-13708

Maj. Op. at 15 (quoting *Inspect*, Oxford English Dictionary (2d ed. 1989)).    Nevertheless, the Majority opinion relies on *Mandel Grunfeld & Herrick v. U.S. Customs Service*, 709 F.2d 41, 42–43 (11th Cir. 1983), in ruling that the NVRA only requires in-person public inspection.  Maj. Op. at 16–17.  *Mandel Grunfeld*, however, is a forty-year-old case brought under the Freedom of Information Act ("FOIA") that only analyzed the meaning of "available," and was issued well before the extensive reliance by government agencies on computerized databases and before HAVA and Alabama's requirements that all voter registration records be maintained electronically.  709 F.2d at 42–43.  In *Mandel Grunfeld*, the crux of the plaintiff's complaint was the government's decision not to mail him the records requested because he did not wish to travel to the location where the records were stored, but there was never any assertion that meaningful inspection was impossible.  *Id.* at 41–43; *see also Nolen v. Rumsfeld*, 535 F.2d 890, 891–92 (5th Cir. 1976) (ruling against plaintiff in FOIA case where federal agency made "available" the documents related to plaintiff's requests, and where there were no restrictive limitations on plaintiff's access to documents).  Thus, while the meaning of "available" has received some attention, this Court has not comprehensively addressed the meaning of "inspection" in a records-request context where an agency has erected onerous time, place, and manner restrictions on accessing public documents.

The trial testimony of GBM's lead volunteer spoke precisely to GBM's goal of *inspecting* the records, which was frustrated by the Secretary's policy.  In lists consisting of over a hundred-

22-13708  ABUDU, J., concurring in part and dissenting in part     21

thousand names, it is simply not possible for individuals to fully, carefully, or critically review the entries for errors in the span of four hours without the aid of technology, other than limited note-taking.  While this Court has explained that "availability" is not "delivery," *Mandel Grunfeld*, 709 F.2d at 43, it has not addressed the meaning of "inspection," particularly as it relates to the format in which the records are provided.  The plaintiff in *Mandel Grunfeld* did not argue that the records sought were less subject to inspection when he was compelled to travel for inspection and copying.  *See id*. at 42–43.  His ability to inspect the records remained the same, whether from his home in Florida or in a government office in Puerto Rico.  Not so here.

The Secretary's public inspection policy precludes individuals from "look[ing] carefully into" or "view[ing] closely and critically" the voter registration records.  *See Inspect*, Oxford English Dictionary (2d ed. 1989).  As evidenced at the trial, GBM was unable to engage in any meaningful review of the voter registration records under the Secretary's new policy.  In other words, the Secretary's failure to provide the documents sought in digital format is a failure to allow an inspection of the same.  Thus, the Secretary's policy violates the NVRA's requirement that the records be made "available for public inspection."  *See* 52 U.S.C. § 20507(i)(1) (emphasis added).

Although this Court previously rejected arguments based on the import of the NVRA's purpose in *Bellitto v. Snipes*, that case is distinguishable.  935 F.3d at 1201.  In *Bellitto*, the Court

acknowledged that some of the NVRA's purposes are "in some tension with each other." *Id.* The Court explained that arguments premised on one purpose (ensuring that voter rolls remain accurate and current) did not mandate the proffered construction of the text, which would possibly run contrary to another NVRA purpose (increasing voter registration). *Id.* Accordingly, the Court declined to consider the NVRA's purpose at all, and it limited its analysis to the text of the statute, which the Court had already found to be "plain and unambiguous." Here, in contrast, there is neither evidence nor argument indicating that the Secretary's provision of voter registration records in digital format would undermine any purpose of the NVRA. Therefore, while purpose should not be the determinative factor in every case involving statutory interpretation, it should prevail here when ignoring the statute's purpose enables one party to effectively evade the law.

Considering the impracticality of the Secretary's public inspection policy, the absence of any valid rationale supporting that policy, and the low burden the Secretary bears for producing digital records, his persistent refusal to provide records requested pursuant to the NVRA in digital format equates to evading the NVRA's disclosure requirements. Accordingly, the Secretary's interpretation of "public inspection" should be rejected. The district court's factual findings regarding the efficiency, cost-effectiveness, and timeliness of sending the documents electronically were not clearly erroneous, and this Court should affirm the district court's ruling that production of the documents in digital format in this case was required under the NVRA.

22-13708  ABUDU, J., concurring in part and dissenting in part      23

### D.  The Reasonable Fee Dispute

On appeal, the Secretary also questions whether, if the NVRA does require the production of electronic records, "does the Secretary of State's fee of one cent per name constitute a 'reasonable cost'?"  In response to his own question, the Secretary contends that if he must produce lists electronically, "the Secretary's fee for all requesters is reasonable."

GBM primarily argues that the fee dispute is moot but, as the Majority Opinion correctly noted, it is not.  Maj. Op. at 8 n.3.  GBM also asserts that "[i]f 'public inspection' includes . . . access to electronic records, the NVRA arguably does not allow the Secretary to impose any fee for that access."  GBM further explains that it does not outright oppose any fee, but it argues that any fee must be reasonably linked to the State's cost of production, as opposed to the existing fee, which results in an inflated cost for production of the list.

In this case, we need not address the contours of reasonability because GBM's right to the records in electronic format arises under the right to "public inspection" rather than "photocopying."    52 U.S.C. § 20507(i).    Here, the Secretary conceded at trial that the NVRA "does not allow the State to charge for any cost associated with public inspection."  This concession aligns with the plain meaning of Section 20507(i), which allows for "photocopying at a reasonable cost," but does not similarly designate that costs may be assessed for public inspection.  *Id.*

### E.  The Need for Amendment to the NVRA

As a final note, Congress should consider amending the NVRA to require the production of public records in the digital format that states already maintain through their computerized voter registration databases, unless the State offers a reasonable justification for another method of production.  The Secretary's refusal to provide voter registration records in digital format runs contrary to both policy and practical considerations, and it exposes the abuses of discretion that will be mitigated by adding clarifying language to the NVRA.

As the district court observed, there are unnecessary additional costs associated with requiring physical inspection or printed copies of requested public records.  The Secretary's deputy chief of staff conceded as much.  Specifically, he explained during his deposition and at trial that a "public inspection" pursuant to the Secretary's current policy would impose, in addition to the same cost of data processing or filtering that accompanies provision of digital records, the cost of a staff member supervising the individual inspecting the records.  The district court could not identify any rationale for this new policy other than a desire "to frustrate the aims of the public-inspection provision by making it more difficult and costly for GBM to access the records to which it is entitled."

Providing for the release of voter registration records in digital format reduces barriers to eligible voter registration and participation while also making it easier to address concerns about

22-13708  ABUDU, J., concurring in part and dissenting in part    25

the integrity of the electoral process.  It is common knowledge, and the district court specifically found, that records in digital format can be produced and utilized with greater speed and efficiency than physical copies, all at a much lower cost.

In short, if Alabama continues to erect unnecessary and cost-prohibitive barriers to accessing public documents, thus frustrating the NVRA's purpose and the state's own implementing legislation, Congress should amend the public disclosure provision because satisfying an applicant's request through digital production is more efficient, cost-effective, and timely than any other method of production the State has proposed.

## IV.    CONCLUSION

For the foregoing reasons, I respectfully dissent in part.